STATE, RESPONDENT, *v.* HANLON, APPELLANT.

(No. 2,626.)

(Submitted March 12, 1909.  Decided April 5, 1909.)

[100 Pac. 1035.]

*Criminal Law—Homicide—Self-defense—Evidence—Admissibility — Offer of Proof — Cross-examination — Conspiracy — Threats—Instructions—Presumption of Innocence.*

Offer of Proof—Exclusion—When Proper.
  1. In a prosecution for homicide, an offer of proof, some matters contained in which were competent and others incompetent because hearsay, was properly excluded as a whole.
Homicide—Evidence—Admissibility.
  2. Defendant and deceased were members of two opposing factions in a mining town. The defendant knew that the latter had made threats against his life. An attempt had been made to kill him the night before the homicide. Among other acts of violence by the deceased was the "shooting up" and demolishing of a saloon, owned by defendant's employer, also a member of the faction to which accused belonged. Of this occurrence, which happened the night before the killing, defendant had no personal knowledge, but had been informed thereof by others, and also by deceased during an interview sought by him and which culminated in the affray. Counsel for defendant thereupon offered to prove by a witness who was present at the incident in the saloon that deceased had given him and others money for the purpose of raising a disturbance there, that they and deceased went there for that purpose, that the latter fired numerous shots and assaulted the barkeeper, knocking him senseless. This offer was excluded. *Held,* that the evi-

dence was admissible as tending to furnish a basis for a conclusion by the jury, in view of the threats theretofore made by deceased, that defendant, with knowledge of deceased's conduct at the saloon, had just ground for apprehension that his life was in danger or that he might suffer great bodily harm at the hands of deceased, and therefore acted in self-defense.

Same.

3. The offered evidence referred to in the above paragraph was further admissible as showing one of a series of acts of violence leading up to the killing, and indicating a continuous aggressive and dangerous disposition in deceased, as well as shedding light upon the motives of deceased in seeking the interview with defendant which ended in the killing, and at which, according to defendant's testimony, deceased referred to the incident in the saloon and impliedly threatened him with violence of the same character if he persisted in opposing the faction to which he, deceased, belonged.

Same.

4. The defendant having testified that deceased, in his interview with him, alluded to the occurrence in the saloon on the night previous, the excluded evidence was also admissible as tending to corroborate that statement.

Same—Specific Act of Violence—Discretion.

5. In the admission of evidence of the character of that included in the offer of proof referred to in paragraph 2 above, the court should be guided by a wise discretion; but in all cases where the specific act sought to be called to the attention of the jury, by reason of its proximity in time and place, would legitimately reflect upon the conduct or motives of the parties at the time of the affray, and especially when it bears some relation to the homicide, it should be admitted; and the fact that collateral issues may thus be presented cannot be held conclusive against the value of the evidence.

Same—Cross-examination.

6. A witness for the state had testified on direct examination that defendant had made threats against deceased a short time prior to the homicide. The witness was shown to have been financially interested in a mining company, the adherents of which composed the faction to which deceased belonged. On cross-examination he was asked if he had not stated in the presence of certain persons named that deceased, when he struck defendant over the head with a club immediately before the killing, had done just what he and the managing director of the company had told him to do. He was not permitted to answer. *Held*, to have been proper cross-examination. The witness' evidence in chief was material and damaging to defendant, and an affirmative answer would have shown that he was an interested witness, while a negative one would have opened the way to contradiction.

Same—Evidence—Insufficient Knowledge.

7. Where a witness' answer showed a want of sufficient knowledge to enable him to testify on the subject about which he was interrogated, his statement was properly stricken out.

Same—Evidence—Admissibility.

8. A witness for defendant testified that when deceased fell he saw a pistol fall as if coming from his hand, that he picked it up and kept it until the day of the trial. On cross-examination he stated that he had told the sheriff a few days after the shooting that he had not seen any pistol fall from the body of the deceased. On redirect examination he was asked to give his reasons for making such statement to the sheriff, but was denied permission to answer. The ruling *held* to have

been error. In view of the material importance of the evidence, and for the purpose of removing the suspicion that his testimony on direct examination was a fabrication, he should have been permitted to give his reasons for making the apparently inconsistent statement to the sheriff.

Same.

9. Evidence that a few weeks before the homicide witness met deceased, who was armed, and stated to witness that he was going to a certain mining claim, and that if accused was there he was going to put him off, was admissible as showing a spirit of antagonism in deceased toward accused, as well as a disposition to take the law into his own hands.

Same—Evidence—Conspiracy.

10. Evidence of an agreement or general understanding between the members of one faction to drive out of a community, by means of force and violence if need be, all persons belonging to another, was competent in a prosecution for homicide charged against a member of the latter class,—who pleaded self-defense,—as reflecting upon the attitude of the defendant's mind, and that of the deceased, at the time of the killing.

Same—Threats Against a Class—Evidence.

11. A hostile threat against a class of persons is a manifestation of a hostile state of mind against each person of that class.

Same.

12. Words and acts of one class of persons banded together for an unlawful purpose, importing hostility to another class, are imputable to all who belong to it, and, upon an issue of self-defense on a charge of murder alleged to have been committed by a member of the latter class upon one of the former while the deceased was apparently in pursuit of the common hostile purpose, should be received in evidence in favor of defendant, subject to the limitation that a wise discretion be exercised by the court in its admission, reviewable only in case of manifest abuse.

Same—Instructions—Presumption of Innocence.

13. The court, after fully instructing the jury relative to the presumption of innocence, gave an additional charge that such presumption was not intended to aid a person, who is in fact guilty of a crime, to escape proper punishment, but was designed to prevent the conviction of an innocent person unjustly accused. *Held*, that while the instruction might as well have been omitted, it correctly stated the purpose of the presumption and was not open to the complaint that, by implication, if not directly, it told the jury that if the defendant was in fact guilty of the crime charged against him, he was not entitled to the presumption of innocence.

*Appeal from District Court, Park County; Sydney Fox, Judge.*

BARNEY HANLON was convicted of murder in the second degree, and appeals from the judgment of conviction and from an order refusing him a new trial. Reversed and remanded.

*Mr. W. B. Rodgers, Mr. John H. Tolan, Mr. Fred. L. Gibson,* and *Mr. A. P. Stark,* for Appellant.

The court erred in excluding the evidence relative to what occurred in the Wellcome saloon on the night preceding the homicide. Even if the transaction there had been an independent transaction, and had not been referred to by the deceased as a threat against the defendant, and had stood alone, disassociated from any occurrence upon the ditch, it would nevertheless, under the modern and logical rule, be competent and material evidence, when communicated to the defendant, and would tend to show the just apprehensions of the defendant, and that he had reasonable grounds to believe that he was in danger of losing his life or receiving great bodily harm at the hands of the deceased, and it would tend directly and logically to show the state of the defendant's mind at the time he was assaulted, as he testifies he was by the deceased, and this is, of course, a most material inquiry. (*People* v. *Harris,* 95 Mich. 87, 54 N. W. 648; *Boyle* v. *State,* 97 Ind. 322; *Childers* v. *State,* 30 Tex. App. 160, 28 Am. St. Rep. 899, 16 S. W. 904; *State* v. *Burton,* 63 Kan. 602, 66 Pac. 633; *Bowlus* v. *State,* 130 Ind. 227, 28 N. E. 1115; *Sneed* v. *Territory,* 16 Okl. 641, 86 Pac. 71; *State* v. *Beird,* 118 Iowa, 474, 92 N. W. 694; *People* v. *Powell,* 87 Cal. 363, 25 Pac. 481, 11 L. R. A. 75; *State* v. *Shadwell,* 22 Mont. 573, 57 Pac. 281; *Cannon* v. *People,* 141 Ill. 270, 30 N. E. 1027; see, also, *Patten* v. *People,* 18 Mich. 326, 100 Am. Dec. 173; *Campbell* v. *Commonwealth,* 88 Ky 402, 21 Am. St. Rep. 349, 11 S. W. 290; *Larsen* v. *State* (Tex. Cr.), 29 S. W. 782; *Gunter* v. *State,* 111 Ala. 23, 56 Am. St. Rep. 17, 20 South. 633; *Renfro* v. *Commonwealth,* 11 Ky. Law Rep. 246, 11 S. W. 815; *Thomas* v. *State,* 44 Tex. Cr. 344, 72 S. W. 178; *Bowers* v. *State,* 122 Wis. 163, 99 N. W. 447; *State* v. *Thrailkill,* 71 S. C. 136, 50 S. E. 551.)

The exclusion of evidence which tended to show that, a short time previous to the encounter between the deceased and the defendant, the former was armed with a pistol, was error. (*Smith* v. *State,* 75 Miss. 542, 23 South. 264; *Fields* v. *State,*

46 Fla. 84, 35 South. 185; *Reynolds* v. *State*, 1 Kelly, 220; *King* v. *State*, 65 Miss. 576, 7 Am. St. Rep. 681, 5 South. 97; *State* v. *Graham*, 61 Iowa, 608, 16 N. W. 743.)

The question asked the witness Campbell as to why he had not mentioned the fact that he had taken a pistol from the body of the deceased, to anyone outside of counsel for defendant, was proper cross-examination. (*State* v. *McGahey*, 3 N. D. 293, 55 N. W. 753; *Williams* v. *State*, 61 Wis. 281, 21 N. W. 62.)

By the instruction found in paragraph 7 of the opinion, the court destroyed the fundamental principle which lies at the foundation of the administration of our criminal law, and deprived the defendant absolutely of the benefit of the just and legal effect of the presumption of innocence that attended him at every stage of the proceeding. In *Coffin* v. *United States*, 156 U. S. 453, 15 Sup. Ct. 394, 39 L. Ed. 481, the supreme court of the United States said: "The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." For the effect and meaning of an instruction couched in such terms upon other, but analogous, propositions, see *Remsen* v. *People*, 43 N. Y. 6; *People* v. *Wileman*, 44 Hun, 187; *State* v. *Shadwell*, 26 Mont. 54, 66 Pac. 508; *State* v. *Sauer*, 38 Minn. 438, 38 N. W. 356; *State* v. *Lindley*, 51 Iowa, 343, 33 Am. Rep. 139, 1 N. W. 484; *Edgington* v. *United States*, 164 U. S. 364, 17 Sup. Ct. 72, 41 L. Ed. 467; *Territory* v. *Baca*, 11 N. M. 559, 71 Pac. 460. Sacred and pre-eminent above all other rights of the defendant is the right to have the benefit of the presumption of innocence at every stage of the proceedings against him, and have his guilt established beyond a reasonable doubt before he is convicted. (*Stapp* v. *State*, 1 Tex. App. 738; *Horne* v. *State*, 1 Kan. 42, 81 Am. Dec. 500.)

*Mr. Albert J. Galen*, Attorney General, and *Mr. W. L. Murphy*, Assistant Attorney General, for Respondent.

The exclusion of the offer of proof respecting the occurrences in the Wellcome saloon on the night preceding the shooting was

correct. It is true the general rule in a murder case is that threats communicated or uncommunicated, where self-defense is relied on, are competent for the purpose of showing the state of mind of the defendant at the time the killing took place, and also where doubt exists as to who commenced the affray. The offer of proof here, however, had to do with the misconduct of the deceased toward third persons, and no threat or threatening action toward this defendant can by any possibility be discovered in the incidents contained in the offer of proof. The great weight of authority is against the admissibility of this sort of evidence. (*People* v. *Henderson,* 28 Cal. 470; *Thomas* v. *People,* 67 N. Y. 223; *Eggler* v. *People,* 56 N. Y. 642; *People* v. *Druse,* 103 N. Y. 655, 8 N. E. 733; *People* v. *Rodawald,* 177 N. Y. 427, 70 N. E. 1; see, also, *Fitzhugh* v. *State,* 13 Lea, 258; *State* v. *Ronk,* 91 Minn. 419, 98 N. W. 334; *People* v. *Farrell,* 137 Mich. 127, 100 N. W. 265.) What a third person told defendant as to deceased's being a bad man, as to his having killed other men, is not admissible. (*Harrell* v. *State,* 39 Tex. Cr. 204, 45 S. W. 581.) Indeed, the doctrine seems to be generally recognized that the violent or dangerous character of the deceased can only be established by general reputation and not by specific acts, and in the cases herewith submitted the doctrine is announced without qualification that the exclusion of the offer of proof in question was correct. (*Garner* v. *State,* 28 Fla. 113, 9 South. 841; *People* v. *Gordon,* 103 Cal. 568, 37 Pac. 534; *Thornton* v. *State,* 107 Ga. 683, 33 S. E. 675; *Stalcup* v. *State,* 146 Ind. 270, 45 N. E. 334; *Davenport* v. *State,* 85 Ala. 336, 5 South. 152; *Campbell* v. *State,* 38 Ark. 498; *People* v. *Griner,* 124 Cal. 19, 56 Pac. 625; *Andrews* v. *State,* 118 Ga. 1, 43 S. E. 852; *Jenkins* v. *State,* 80 Md. 72, 30 Atl. 566; *People* v. *Dowd,* 127 Mich. 140, 86 N. W. 546; *King* v. *State,* 65 Miss. 576, 7 Am. St. Rep. 681, 5 South. 97; *McKenna* v. *People,* 18 Hun, 580; *State* v. *Mims,* 36 Or. 315, 61 Pac. 888; *Alexander* v. *Com.,* 105 Pa. St. 1; *State* v. *Dill,* 48 S. C. 249, 26 S. E. 567; see, also, *State* v. *Shadwell,* 22 Mont. 559, 57 Pac. 281.)

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

The defendant was convicted of murder in the second degree. He appealed from the judgment and an order denying his motion for a new trial.

The homicide occurred about 11:30 o'clock on the morning of June 6, 1907, at Jardine, in Park county. A few minutes prior to its occurrence the defendant was walking along the principal street of the village in company with one Acklemire. He was armed with a pistol, which he carried in a scabbard partly covered by his coat. The weapon was not concealed otherwise, and the fact that he had it was apparent to a casual observer. As he and his companion passed along the street, he observed the deceased standing on the opposite side, and, going across, accosted him, telling him that he desired to speak to him a moment. Thereupon the two walked back together, passing to a point near the rear of a small building which fronted upon the street. and stood apparently engaged in friendly conversation. They were in plain view to Acklemire, who stood at a point farther along the street, and to others on the opposite side. What was said by them was not heard by any witness. As they approached this point the deceased handed to defendant a small bottle of whisky. He retained the bottle, but did not drink. In a few moments one of the state's witnesses, named Menisto, familiarly called "Dago Joe," went across the street to them. He handed to the deceased a switch, or stick, described by him and other witnesses as about as thick as a man's little finger and about three feet long, at the same time stopping to drink from the bottle, which in the meantime had been returned by defendant to the deceased. He then went away. He had no conversation with either of the two except to say to the deceased as he handed him the stick, "That is your whip; I don't need that." To this the deceased replied, "All right, Joe." This witness had stated that a few minutes before the appearance of the defendant he had met the deceased with the stick in his hand and deceased had given it to him. Another witness stated

that the deceased was in the habit of carrying in his hand something of the character of the stick in question. After Menisto left, the conversation between the defendant and deceased continued. It was without gestures or loud talk. There was nothing in the manner of either of them to indicate that they were not on friendly terms or that the subject of their conversation involved any feeling. The two stood side by side for some moments, the deceased switching or digging into the ground with the stick. He then shifted his position somewhat so as to face the defendant, continuing to use the stick as before. While he was apparently looking toward the ground, the defendant drew his weapon and fired at him. This shot was apparently ineffective. The deceased began to back away, or, as some of the witnesses stated, began to run away. After a short interval the defendant fired two more shots in rapid succession, one of which struck the deceased just above the heart and passed through his body, killing him almost instantly. The defendant remained standing where he was when the deceased fell, holding his weapon in his hand in a menacing attitude toward some of those who ran to the assistance of the deceased, and applying vile epithets to them. There is some evidence to the effect that during the morning and at a previous time the defendant had made threats against the life of the deceased. The deceased had no other weapon than the small stick. This narrative of the occurrence is gathered from the testimony of the state's witnesses. It is controverted in some important particulars, as will appear from the following narrative of the defendant himself and his witnesses:

On the preceding day the defendant had been engaged in repairing a ditch belonging to a Mrs. Wellcome, who resided in the village. This ditch is a short distance to the east. Late in the evening, as he was about to finish the work, some one set off a charge of dynamite or giant powder in the ditch, with the double purpose, as defendant thought, of damaging the ditch and killing himself. The explosion occurred immediately after the defendant had crossed the ditch in the pursuit of his work and at the point where he crossed. He at once went away

and spent the night at Mrs. Wellcome's home. Mrs. Wellcome owned, or had an interest in, a saloon in the village which was run by two men named Wells and Oliver. During the night some one had, in the language of the witnesses, "shot up the place," doing a good deal of damage. Early on the next morning the defendant went with Mrs. Wellcome and others to see the extent of the injury. After Mrs. Wellcome went away, and while he and the others were still there, they heard two or three explosions in the direction of the ditch. Presently he and Acklemire, who was present, determined to go and ascertain the result of the explosions and, if possible, the cause also. This was the mission on which the defendant was bent when he observed deceased on the opposite side of the street, and, as he and some of his witnesses stated, was accosted by him and asked for an interview. What was said and done by the two after that time was stated by the defendant as follows: "Lannon says to me, 'Barney Hanlon, do you remember what Mr. Ryan told you the 15th of May? You remember what he told you about blowing you up with powder and striking you over the head with a heavy club?' I says, 'Yes, Tom, I remember about it'; and he says to me, 'Barney Hanlon, if you don't quit the old-timers and come to our side, with me and Hector McDonald and Billy McQuillan and Ryan and Zane, we will blow you to hell.' * * * He says to me, 'Barney Hanlon, if you don't quit, if you don't give up going with the old-timers and pull away from them, myself and Hector McDonald and Billy McQuillan and Ryan and Zane will blow you to hell.' I told him I would never quit the old-timers and go with an old —— of a —— like that, and go with 'cabbage thief' Ryan. * * * He says, 'Barney Hanlon, you remember what the old man said to you on the 15th of May outside the barber-shop?' And I says, 'Yes, I remember all about it.' * * * At the time I handed this bottle to Lannon, Lannon says to me, 'Barney, you wait a while; we have done with you fellows, and I will blow you to hell myself.' He made this remark to me three different times. He also said to me, 'You know what happened to the ditch last night. Well, we came pretty nearly getting you on the

ditch last night. Myself and Dougherty came pretty nearly fixing you last night, and if you don't give up running around with those old-timers we will blow you to hell.' When Joe Menisto, or 'Dago Joe,' came around the corner of the barber-shop he had a club with him and he gave the club to Tom Lannon, and Tom Lannon handed him the bottle, and when Lannon got the club he straightened up and gave the club, the heavy end of the club, two or three rubs, and he gave two or three rubs on the floor, and he came down double-handed and struck me right on the forehead. Just before he struck me with this club he told me if I didn't quit running around with the old-timers and go to their side, then they would blow me to hell. After he struck me with the club he took the club in one hand and came after me and made a dart into his pocket for a gun. When he struck me I started back, and he struck me such a blow that it staggered me back, and I went and pulled my gun and went to shoot him. I fired three shots; at the time I fired these shots I thought the man had me about dead. I saw right at once that Ryan's vengeance was pulling on me, and what he said about blowing me up at the barber-shop; and I went to work and tried to save my life. He also spoke about the Wellcome saloon, and said to me, 'You see what happened to Mrs. Wellcome's saloon last night?' And I replied I saw the damage it done; and he says, 'Barney Hanlon, if you don't quit running around with the old-timers we will blow you to hell.' * * * I have referred several times to what Mr. Ryan said to me at the barber-shop. I had this talk with Mr. Ryan on the 15th of May. They were trying a case at the barber-shop on that day. Tom Davey was the defendant in that case, and on that day I.was working for Tom Davey. The conversation I had with Mr. Ryan was about twelve or thirteen feet southeast of the barber-shop, and it was about half-past 1 o'clock. Mr. Ryan told me that I was bringing men in to jump mining ground. He told me if I didn't stop bringing men around jumping ground that he would have me blown up or have my head broken with a club.'' Again, in referring to the attempt to blow him up on the Wellcome ditch, he made the following

statement: "That was on the 5th of June. I will explain to the jury what that attempt was. It was about half-past 8 in the evening; I walked over to the ditch there that I was in charge of and working on, and this man Lannon went to work and put a bomb of powder on the flume there and pretty nearly blew me up. That is the nearest I ever came to being blown up. He put the powder on the flume and it exploded. I had been at the point where the explosion took place not two minutes before. If I had been two minutes later, it would have blown me to pieces." On cross-examination he stated that, while in the act of backing away from him, the deceased drew a pistol, and when he fell he had it in his right hand, pointing as if to shoot, while with his left he was trying to open the rear door of the barber-shop, which he had reached at the moment the third shot was fired. He also stated that up to the time deceased struck him with "the club" they had always been good friends; that they had never had any trouble. Several witnesses controverted the statement of the defendant that the deceased struck him with the stick. Some of the eye-witnesses introduced by him testified that they saw the stroke, and stated that the defendant staggered under it. Others testified that immediately after the shooting there was a contusion over defendant's right eye, whereas it was not there immediately prior to the shooting; some stating that it had bled somewhat. One witness testified that, at the time the deceased fell, he himself was standing looking from an upper window in the rear of the barber-shop building, and saw a pistol drop as if coming from the hand of the deceased, and that he picked it up and kept it in his possession until the day of the trial. Others testified that, when the body of the deceased was picked up, a pistol was found in a hip pocket of his pantaloons. Still other witnesses stated that during the morning, shortly prior to the killing, the deceased had two pistols in his possession. On the whole, the evidence is exceedingly conflicting on this point. It appeared further that the Kimberly-Montana Gold Mining Company owned a mill and mining property at Jardine, and that the deceased was in its employ as night-shift boss; that Ryan was its managing director;

that there was some controversy between Mrs. Wellcome and the company over the ditch, referred to by the defendant, and that the three explosions heard by him while at the Wellcome saloon had been caused by the deceased and a man named Dougherty, also an employee of the company, in an effort to destroy the ditch. This somewhat extended statement we have deemed necessary to a clear understanding of the contentions of counsel arising upon the rulings of the court upon questions of evidence.

1. The defendant, admitting the killing, attempted to justify it on the ground of self-defense. During the giving of his testimony he stated, in substance, that he was not present at the Wellcome saloon on the preceding night, and had no personal knowledge of what took place there, but had learned about the occurrence from statements made to him by others, and from what he had seen of the result the next morning. Upon objection by counsel for the state that his statement would be hearsay and therefore incompetent, he was not permitted to give any of the details. Thereupon counsel offered to have him testify as follows: "That on the night preceding the time when he had the difficulty with Lannon, which resulted in his shooting Lannon in the manner heretofore described by him in his testimony, the deceased, Lannon, with several of his friends, went into the Wellcome saloon, which has been described in the testimony, and created a disturbance, which resulted in Lannon shooting up said saloon, to the injury and destruction of a considerable property therein, and the serious injury of one of the persons in charge thereof. That Lannon was armed at the time, and himself had done some or all of the shooting in the saloon; that deceased, immediately before he was shot by defendant, had referred to this affair in his talk with the defendant, and this defendant knew about the affair from statements made to him by others within a short time before his difficulty with Lannon, and had himself seen and observed the results of the difficulty in the saloon." This offer was rejected. The ruling is assigned as error.

It is argued that the evidence was admissible on the grounds: (1) That since the details of the incident had been communicated to the defendant, a statement of them, even though the incident had no direct connection with the affray, would have tended to furnish a basis for a conclusion by the jury that, when the defendant killed the deceased, he had just ground for apprehension that he was in danger of death or great bodily harm at his hands, and therefore acted in necessary self-defense; (2) that in view of the facts already appearing in the evidence, namely, that he was the servant of Mrs. Wellcome, that the saloon was her property, that the ditch had been damaged and an attempt made upon his life the evening before while he was at work on it, and for that reason; that another attempt had been made to destroy the ditch during the morning; that the deceased was the servant of the company, and that there was friction between Mrs. Wellcome and the company; that all these matters were called to his attention by deceased during their conversation, coupled with threats—the fact that the deceased had gone to the saloon armed, and wrecked it, incidentally assaulting and seriously injuring a person in charge of it— was one of the chain of events leading up to the tragedy, showing a continuing disposition in the deceased to violence, and would have aided the jury in arriving at a just conclusion as to who was the aggressor; and (3) that it would have corroborated the statement of the defendant as to what was said immediately prior to the killing, by tending to show that his statement was not a mere fabrication, as well as to enable the jury to understand the purport of the threats uttered by the deceased at that time.

Technically, the ruling was correct. The language in which the offer is couched indicates two purposes: First, to have defendant detail the events of the evening as upon his own knowledge, and, second, to have him state that he had been informed of them by others. Having no personal knowledge of them, a narrative of them by him, however material if properly established, would have been hearsay; for while he saw the damage done to the property, and, therefore, had personal knowledge

of the extent of it, he did not know that the deceased did it, nor that he was armed, nor that he assaulted the person in charge of the place. As we shall presently see, it was competent for him to state that he had received information of the occurrence from others, even to the extent of detailing what he had been told; yet, since the offer was formulated so as to include other evidence which was manifestly incompetent, the court committed no error in excluding the whole. Besides, the defendant had already testified, in substance, that he had been fully informed of the occurrence, and that the deceased had referred to it immediately before the affray.

2. Counsel then offered to show by another witness, who had been present at the saloon, that the deceased had given him and others money for the purpose of raising a disturbance there; that he and the deceased and others had gone there for that purpose, and did so; that the deceased fired numerous shots from his pistol through the bar mirror and broke up the glassware, and that he assaulted the barkeeper, knocking him senseless. This was excluded as immaterial. Counsel insist that it was competent on all the grounds urged in support of the foregoing assignment. It was held by this court in *State* v. *Shadwell*, 22 Mont. 559, 57 Pac. 281, that specific acts of violence by the deceased toward the defendant and toward others in his presence may be given in evidence upon the question whether the homicide was prompted by malice or by an honest belief that defendant was in danger of great bodily harm. Threats by the deceased against the defendant, communicated to the latter, are always admissible in such cases to show defendant's belief or apprehension of impending danger, subject to the restriction, however, that there must be some evidence of an overt act on the part of the deceased to carry the threats into execution. (*Territory* v. *Milroy*, 8 Mont. 361, 20 Pac. 650; *State* v. *Shadwell*, 26 Mont. 52, 66 Pac. 508.) If there be no such act or motion on the part of the deceased, there is no room for apprehension, no matter what threats may have theretofore been made and communicated to defendant; for mere words, though indicative of bitter hostility, cannot be alleged to justify the taking of

life. A given act might not in itself indicate a disposition to do violence, but the same act, viewed in the light of threats theretofore made, might well create just apprehension in the mind of the defendant, as a reasonable person, whereas but for the known threats there would be no ground for apprehension, and therefore no justification for the killing; so that the value of such threats, as evidence in this connection, is that they reveal to the jury the motives and impulses which actuated the defendant at the time of the killing. By the aid of this evidence, the jury may intelligently answer the question whether the deceased probably intended to carry his threats into effect, and whether the defendant acted upon the belief that such was the case. The measure of the probability that the deceased entertained such intentions would be the precise measure of the justification of the act of the defendant. (*State* v. *Felker*, 27 Mont. 451, 71 Pac. 668.) Of the same value are prior specific acts of violence toward the defendant himself or others in his presence. They show a disposition to violence, and, this disposition being known to the defendant, it may well be regarded as having aroused his fears and as having impelled him to act upon them, whereas otherwise he would have no ground for fears. This is the theory upon which they were held admissible in *State* v. *Shadwell, supra.* So, in *State* v. *Felker,* evidence of prior acts of violence by deceased toward his wife were held admissible in favor of the defendant, who alleged justification on the ground that he acted in defense of his sister, and this though he had not witnessed them. It is true that they were held admissible on the ground that they would have been competent in favor of the sister, had she been the defendant, and were therefore competent in Felker's favor, since he acted in her defense; but there is no substantial reason why such evidence should be deemed of value in such a case and of no value in another, where the violent disposition has been manifested toward third persons. If the violent disposition of Cunningham, as shown by his assaults, was of value to aid the jury in determining the motives which prompted Felker, for the same reason the acts of turbulent violence of the deceased here

would have aided the jury in ascertaining whether the defendant was prompted by malice or by apprehension of danger.

Naturally, after the defendant had been informed of the conduct of the deceased on the previous night, especially in view of the threats theretofore and then made, referring not only to the incidents at the saloon, but also to the attempt on defendant's life at the ditch (if, in fact, they were made, and it was a question for the jury whether they were or not), he would be more likely to attribute a dangerous import to any motion or action or apparent aggression by the deceased than he would otherwise have done, and justly so. The question for the jury to decide was, not whether it was really necessary for the defendant to defend himself, but whether it appeared to him, as a reasonable man, that the danger was imminent and the necessity pressing. This conclusion is not inconsistent with anything said in *State* v. *Shadwell,* 22 Mont. 559, 57 Pac. 281, and finds support in the following authorities: 1 Wigmore on Evidence, sec. 248; *People* v *Harris,* 95 Mich. 87, 54 N W. 648; *Boyle* v. *State,* 97 Ind. 322; *Childers* v. *State,* 30 Tex. App. 160, 28 Am. St. Rep. 899, 16 S. W. 903; *Cannon* v. *People,* 141 Ill. 270, 30 N. E. 1027; *Sneed* v. *Territory,* 16 Okl. 641, 86 Pac. 71; *State* v. *Beird,* 118 Iowa, 474, 92 N. W. 694; *State* v. *Hunter,* 118 Iowa, 686, 92 N. W. 872.

In *Boyle* v. *State, supra,* it was said: "As, in personal conflicts, every man is permitted, within reasonable limits, to act upon appearances and to determine for himself when he is in real danger, it would seem to follow, as an inevitable consequence, that whoever relies upon appearances, and a reasonable determination upon such appearances, as a defense in a case of homicide, ought to be allowed to prove every fact and circumstance known to him, and connected with the deceased, which was fairly calculated to create an apprehension for his own safety. Any narrower rule than this would, we think, prove inadequate to full justice in all cases of homicide, and would, in many cases, operate as a serious abridgment of the law of self-defense." In *State* v. *Felker, supra,* this court said: "The controversy as to who was in the wrong can be correctly

determined only by revealing to the jury, so far as may be, the exact relations, actions, and intentions of the parties to the affray, so that the jury may give due weight to every fact which influenced the mind of the defendant.''

The admissibility of this character of evidence is not a violation of the well-settled rule that reputation may not be shown by proof of specific acts exhibiting the trait of character in question. This may be shown, of course, only by the testimony of witnesses who speak from knowledge previously acquired by hearsay in the community where the deceased had lived. Such evidence is admissible for the purpose of showing which of the parties to the affray was the aggressor, when there was no eyewitness or when the fact is in doubt.

The testimony was also relevant and material for the second reason urged by counsel. The incident in question had been referred to by the deceased. The threat, at least the implication, was that the same character of violence would be used toward the defendant in case he did not desist from his opposition to the company. The defendant had signified his contempt for Ryan, the managing director, and his intention to persevere in his previous course of conduct. The character of violence, then, wanton and unprovoked as it appears to have been, was material to show who was the aggressor; for it would have tended to show an aggressive and dangerous disposition in the deceased, not only then existing but continuing up to the moment of the affray, as well as to shed light upon the motives which prompted the deceased in seeking the defendant for the interview which ended in the affray. The incident, if the defendant's witnesses are to be believed, was but one of a series of acts of violence, beginning with that upon the ditch and including a renewal of like acts there the next morning, the first having been directed against the defendant as well as his employer. It was, in fact, one of several significant events leading up to the fatal affray. (*State* v. *Smith,* 12 Rich. (S. C.) 430; *Patten* v. *People,* 18 Mich. 314, 100 Am. Dec. 173; *People* v. *Hecker,* 109 Cal. 451, 42 Pac. 307, 30 L. R. A. 403; *State* v. *Beird, supra.*)

Some courts exclude this character of evidence altogether, unless the particular acts of violence form a part of the *res gestæ.* (*Thomas* v. *People,* 67 N. Y. 218.) Even the same courts that admit evidence of such acts, when they have been observed by the defendant, as in Michigan (*People* v. *Harris, supra*), exclude evidence of all such as are not connected with or observed by him, as too remote and as giving rise to collateral issues, the investigation of which would confuse the issue on trial. (*People* v. *Farrell,* 137 Mich. 127, 100 N. W. 265.) But no hard-and-fast rule of exclusion may be laid down. A wise discretion should be the guide, and in all cases where the specific act, by reason of its proximity in time and place, would legitimately reflect upon the conduct or motives of the parties at the time of the affray, and especially when, as in this case, it bears some relation to the main fact, the homicide, it should be admitted. (1 Wigmore on Evidence, 248.) It is within the purview of this limitation that we hold the evidence offered in this case to be admissible. The fact that collateral issues may be presented in a particular case cannot be held conclusive against the value of the evidence; for even in cases where communicated threats are admissible, whether they were made or communicated may be controverted, and thus a collateral issue presented. So, too, such an issue may arise upon the evidence tending to show specific acts of violence, testified to as having been done to defendant himself or to others in his presence. If the rule that the presence of such an issue is sufficient reason to exclude the evidence must prevail, then its admissibility would always depend upon whether the doing of the particular act is admitted or not controverted.

Under the circumstances presented in this case, we think the evidence was also admissible on the third ground. The fact that the incident had actually occurred would have tended, in some measure at least, to corroborate the testimony of the defendant and show that his report of the conversation which occurred between him and the deceased was not a fabrication. And, as we have already stated, it would have enabled the jury to understand the purport of the threats uttered by the deceased

at that time. While the offer should have included, also, the fact that the witness had communicated the conduct of deceased to defendant, in view of the fact that the latter had already shown that he had been made acquainted with it, the offer was sufficiently comprehensive to make the evidence admissible for all purposes.

3. Houseman, one of the witnesses for the state, had testified to certain threats made by the defendant against the deceased a short time prior to the homicide. His evidence had shown that he was interested with Ryan in the Kimberly-Montana Gold Mining Company through a corporation organized to take over its property. He was not at Jardine on the day of the difficulty, but was a few days afterward. He further stated that he had been compelled to appear as a witness against his will. On cross-examination he was asked if he was not at the saloon of one Malloy, in Jardine, on or about July 1, and if he did not at that time, in the presence of certain persons named, state that the deceased had done just what he and Ryan had told him to do, when he batted the defendant over the head with the club that morning, referring to the time of the homicide. He was not permitted to answer, on the ground that the question was not proper cross-examination. This was error. His evidence in chief was material and damaging to defendant. Without reference to his interest in the company or his association with Ryan, his answer in the affirmative would have shown a condition of mind adverse to the defendant, and, to that extent, that he was an interested witness. A negative answer would have opened the way for contradictory evidence by the persons who heard his statements. The inquiry was well within the bounds of legitimate cross-examination. (Revised Codes, sec. 8021; *Kipp* v. *Silverman*, 25 Mont. 296, 64 Pac. 884.) The witness was then questioned, and gave answers as follows: "Q. Did you know a man by the name of Duffy, a Pinkerton detective, who was sent out from Chicago to work up this case? A. He is a McGuire & White detective. Q. Was it at your instance or at the instance of your company that he was sent out here? A. I really don't know who sent him out here. I

think he was in the interest of the company. I didn't see him, nor did I know Mr. Ryan, and I knew, however, that he was there." On motion of counsel for the state, all of this testimony was stricken out. The ruling was correct. If it be assumed that it was material to show that the company had employed a detective to gather evidence for the prosecution, the statements of the witness showed a want of knowledge of the fact sufficient to enable him to testify to it.

4. A witness by the name of Campbell testified, as already narrated, that at the time when the shooting occurred he was looking from an upper window in the rear of the barber-shop building; that when the deceased fell he saw a pistol fall as if coming from the hand of the deceased, and that he picked it up and kept it until the day of the trial. It had appeared from his statement that he had gone down the stairway to the body, picked up the pistol, put it under his coat and returned immediately to his room above, and concealed it in his bed. On cross-examination it appeared that he had been questioned by the sheriff a few days afterward as to whether he saw a pistol taken from the body of the deceased, and had stated that he had not. He had stated further that he had told Mr. Gibson, one of counsel for the defendant, that he had picked up the pistol, but had told no one else in that locality, meaning Jardine. On re-examination he was asked why he had not mentioned the fact to anyone else. He was not permitted to answer. The purpose of the question was to allow the witness to explain his silence, and thus to remove suspicion that his story was a fabrication. It was competent for this purpose, especially so in view of his apparently inconsistent statement to the sheriff and the material importance of his evidence; and, if he had a reason or explanation, he should have been allowed to give it. (*State v. Welch,* 22 Mont. 92, 55 Pac. 927.)

5. The defendant's witness Miller testified, in substance, that he knew defendant and deceased; that he met the latter at Jardine during the latter part of May, 1907; that he then had a gun; that he stated to the witness that he was going up to a mining claim belonging to the company, giving its name, and

that if the defendant was there he was going to put him off; that the deceased and another then got horses and went away, and having presently returned with his companion, he stated to the witness that he did not find the defendant. On motion of counsel for the state, the whole of the statement was stricken out as hearsay. The ruling was erroneous. The evidence tended to show in deceased a spirit of hostile antagonism toward the defendant, as well as a disposition to take the law into his own hands, as evinced by the fact that he was armed and that he intended, as his declaration implied, that violence would be resorted to if necessary in order to accomplish the mission upon which he was bent. This is true whether he was acting for the company or upon his own motion. While it may well be said that the evidence was in itself of slight weight or value, it comes within the rule of admissibility heretofore stated. It should have been allowed to stand.

6. Error is assigned upon the action of the court in excluding the evidence of several witnesses by whom the defendant offered to prove, substantially, the following: That for three years prior to and including June 6, 1907, there were two factions among the people residing and doing business at Jardine, one called the company faction, and the other the old-timers' faction; that practically every one there was identified with one or the other faction; that the first consisted of Ryan, the manager and managing director of the Kimberly-Montana Gold Mining Company, which owned quartz-mills and worked and operated several mining claims in connection therewith, and owned most of the real estate included in the site of the village, and the employees and agents of the company, among them the deceased and others associated with the company in the conduct of its boarding-house and saloon; that the other consisted of all old residents and early locators of mining claims there, together with others who were not connected with the company in any way; that the defendant was identified with the latter faction, and owned a mining claim adjoining the property of the company; that it was the declared purpose of Ryan to

drive all old-timers from the camp; that in August, 1905, Ryan proposed to one of the witnesses that if the witness would act as the leader, he, Ryan, would furnish all the men, arms, and ammunition necessary to drive all the old-timers out; that as late as May 13, 1907, Ryan, in a conversation with one of the witnesses, expressed the intention to carry out the purpose of the company faction; that at the same time the witness was employed by the defendant to work on his claim; that the witness had located claims adjoining those of the company; that he was an old-timer; that, just after the conversation re- ferred to, Ryan, aided by Houseman, one of the state's wit- nesses, assaulted him; that deceased was at this time night- shift boss of the company, and was closely associated with Ryan; that in the month of October, 1906, the deceased, then on his way to Butte, declared to another witness: ''I am coming back in the spring, * * * and drive all you old-timers out of the camp''; that this witness also belonged to the old-timers' faction; that Ryan was unfriendly to all of them, and had been using every means to compel old-timers to leave the camp. This recital has been gathered from the offers to prove by dif- ferent witnesses. The evident purpose of counsel was to show that a conspiracy had been formed by Ryan and his associates, including the deceased, to get rid of the trouble that had arisen, as is suggested by other evidence in the record, between the company and some of the owners of adjoining property, and to this end to force them by violence, if necessary, to abandon their claims and leave the locality; and that the affray result- ing in the homicide was due to this factional strife.

It may well be said that no one of the different offers, stand- ing alone, was sufficiently comprehensive to show that the facts embodied in it would throw any light upon the mental attitude and actions toward each other of the parties to the affray, and, therefore, that the court did not err in excluding the evidence as offered. Yet, since another trial must be had for the reasons heretofore stated, it will not be out of place to state briefly our views as to whether, if offered in proper form, the evidence would be of value. If it could be made clear by competent

evidence, direct or circumstantial, that friction producing enmity had grown up between the company's officers and employees and the defendant and others, as Mrs. Wellcome, over the possession and title to mining property in the neighborhood, and that the former had determined to adopt measures to rid the community of those upon whom they cast the blame for this condition, and these measures contemplated the employment of force and violence, and that various acts and threats had been done and made looking to the accomplishment of the common purpose, the defendant being one of the class of persons against whom the hostile and violent purpose was directed, could it for a moment be doubted that this evidence would be competent as reflecting upon the attitude of defendant's mind and that of the deceased at the time of the meeting and at the moment the affray began? Such an agreement or general understanding by the agents and employees of the company would amount to a criminal conspiracy. Each participant would be responsible for the acts and utterances of every other in furtherance of the common purpose. Its existence would evince a hostile and aggressive condition of mind in each member of it, not only toward the class of persons of which the defendant was one, but toward the defendant as an individual; and, if its existence were known to him, it would amount to a constant threat communicated to him, and be well calculated to arouse his fears as to his personal safety whenever there should be an apparent effort on the part of any member of the conspiracy to carry out the announced purpose of it. A hostile threat against a class of persons is a manifestation of a hostile state of mind against each person of that class. (*State* v. *Davis*, 6 Idaho, 159, 53 Pac. 678; *People* v. *Craig*, 111 Cal. 460, 44 Pac. 186; *People* v. *Gross*, 123 Cal. 389, 55 Pac. 1054.)

If the fact of the conspiracy were not known to the defendant, yet the fact of its existence would reflect the attitude of mind entertained by the deceased at the time he sought the interview with the defendant, and would reflect upon the question as to who was the aggressor. Words and acts of one of a class of persons associated together for an unlawful purpose, im-

porting hostility toward another, are imputable to all who belong to that associated class, and, upon an issue of self-defense upon a charge of unlawful homicide alleged to have been committed upon one of the class by such other person while the former was apparently in pursuit of the common hostile purpose, should be received in evidence in favor of the latter for the same purpose and under the same limitations as evidence of specific acts of violence by the former, the admissibility of which has already been discussed. If such acts and threats were the outgrowth of a common design and purpose, they were but links in a series of circumstances leading up to the fatal encounter, and legal responsibility for the result might be determined by a consideration of them. That proof of such facts would lead to an examination of collateral issues is not a conclusive reason that such evidence should be excluded. If a fact is material, evidence of it may not be excluded because its existence may be disputed. As the admissibility of the evidence itself must rest largely in the sound discretion of the trial court, so must the extent to which the investigation of collateral issues arising thereon may go be lodged in its discretion, and its action will not be reviewed except where its discretionary power has been manifestly abused.

7. The contention is made that the court erred in submitting the following instruction: "You are further instructed that the law which throws around the defendant the presumption of innocence, and casts upon the state the burden of proving his guilt beyond a reasonable doubt, was not intended to aid any person who is in fact guilty of crime to escape the proper punishment thereof, but is a humane provision of the law intended, so far as human agencies can, to prevent the conviction of any innocent person who may be unjustly accused of crime." The argument is that the court, by implication, if not directly, told the jury that, if the defendant was in fact guilty of the crime, he was not entitled to the presumption of innocence. While we think the instruction might just as well have been omitted, it does not bear the construction given it by counsel. The presumption of innocence,—the benefit of which everyone has

under the law,—is not intended to protect the guilty. It is a witness in favor of the accused, and furnishes substantial protection to him throughout the trial and until his guilt has been established beyond a reasonable doubt. When the evidence, however, has established the fact of guilt beyond a reasonable doubt, the law is satisfied, the presumption has been overcome, and its office is ended. The instruction states correctly its purpose. If the court had failed to go further and instruct fully upon the subject, complaint might justly have been made, but this the court did, adding the paragraph in question as a precautionary explanation of the purpose of the law, and in doing so it did not err.

The judgment and order are reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*

MR. JUSTICE SMITH concurs.

MR. JUSTICE HOLLOWAY: I agree with the conclusion reached, but I do not agree with what is said in paragraph 2 of the majority opinion. In my judgment, evidence of the character of that to which reference is there had should be excluded, unless the acts or declarations to which it relates form a part of the *res gestæ.*