STATE, RESPONDENT, *v.* WHITWORTH, APPELLANT.

(No. 3,296.)

(Submitted April 19, 1913. Decided May 21, 1913.)

[133 Pac. 364.]

*Criminal Law — Homicide—Self-defense—Threats—Admissibility in Evidence — Cross-examination — Appeal and Error — Technicalities.*

Criminal Law—Appeal and Error—Technicalities.

1. Under the rule that in the disposition of appeals the supreme court will be controlled by considerations of substance and not mere technicality, only assignments of error in a criminal cause by which some substantial right of appellant appears to have been erroneously and prejudicially affected will be reviewed.

Same—Homicide—Self-defense—Cross-examination.

2. In a prosecution for homicide which accused sought to justify under a plea of self-defense, cross-examination of a brother of deceased, relative to a conversation had with him by one of the state's witnesses, bearing upon the truth of the latter's account of a meeting between defendant and deceased a few days before the killing, and

touching the attitude of himself and deceased as one of hostility to appellant prior to and at the time of the affray as well as his own *animus* as a witness, *held* to have been improperly excluded.

Same—Threats—Admissibility in Evidence.

3. Evidence of threats by deceased, directed to but made out of the presence of defendant, was relevant and improperly excluded, where there was a controversy as to who was the aggressor, as to whether there was on the part of deceased an overt act or demonstration sufficient to induce a reasonable fear in the defendant for his personal safety, and as to whether he killed the deceased under the influence of such fear alone.

Same.

4. The fact that prior threats were vague, indefinite and conditional upon catching the person against whom they were directed, in doing a certain act, was no bar to their admissibility, even though the condition did not happen.

*Appeal from District Court, Lewis and Clark County; J. M. Clements, Judge.*

WALTER WHITWORTH, convicted of murder in the second degree, appeals from the judgment of conviction and from an order denying him a new trial. Reversed and remanded.

*Mr. Edward Horsky,* for Appellant, submitted a brief and argued the cause orally.

The court's announcement of the law as to threats, a previous assault, *etc.,* were wholly erroneous. (*State* v. *Shadwell,* 26 Mont. 52, 56, 66 Pac. 508; s. c., 22 Mont. 59, 57 Pac. 281; *State* v. *Felker,* 27 Mont. 451, 460, 461, 71 Pac. 668; *State* v. *Hanlon,* 38 Mont. 557, 100 Pac. 1035.) And these errors were not cured by any instruction to the jury to disregard either the court's or county attorney's remarks, if such error were curable.

Remarks by the trial judge, in the presence of the jury, during the progress of trial, calculated to mislead the jury as to the law governing the case constitute reversible error. (*Southwestern Tel. etc. Co.* v. *Myane,* 86 Ark. 548, 111 S. W. 987; *Illinois Cent. R. Co.* v. *Souders,* 178 Ill. 585, 53 N. E. 408; *Brinckerhoff* v. *Briggs,* 92 Ill. App. 537; *Shippen Bros. Lumber Co.* v. *Gates,* 136 Ga. 37, 70 S. E. 672.)

Throughout the entire trial, the cross-examination of defendant's counsel was unduly restricted. In the trial of capital cases particularly, some latitude, if not liberality, should be permitted;

at least as much as in a civil case. The court was seemingly unaware or unmindful of the decisions of our supreme court, as well as of the provisions of section 8021, Revised Codes, which changes the rule of common law; for apparently he was under the impression that in cross-examination, it was his prerogative to hold counsel to strictness, whereas the decisions uniformly hold that under such a statute as ours, liberality is the rule. (*Cobban* v. *Hecklen,* 27 Mont. 245, 257, 70 Pac. 805; *Kipp* v. *Silverman,* 25 Mont. 296, 64 Pac. 884; *State* v. *Beesskove,* 34 Mont. 41, 53, 85 Pac. 376.)

Threats: In *State* v. *Sloan,* 22 Mont. 293, 56 Pac. 364, the court said that any declaration which indicates, however vaguely and indefinitely, an intention on the part of the deceased to inflict violence upon the defendant is admissible as a threat. In 21 Cyc. 965, the same rule is stated. The trial court held that "uncommunicated threats are inadmissible." But this court in at least three cases had long since held otherwise. (See *State* v. *Shadwell,* 26 Mont. 52, 56, 66 Pac. 508; *State* v. *Felker,* 27 Mont. 451, 460, 71 Pac. 668; *State* v. *Hanlon,* 38 Mont. 557, 100 Pac. 1035.)

Instructions from employer, and nature of controversy: "Evidence as to the defendant's rights in the land in dispute is admissible to show his good faith in the fatal difficulty for the purpose of mitigating his punishment. Where the punishment is largely in the discretion of the jury 'they should be placed as far as possible in the situation of the parties.'" (*Utterback* v. *Commonwealth,* 105 Ky. 723, 88 Am. St. Rep. 328, 49 S. W. 479; see, also, 6 Ency. of Evidence, 626, 627.)

Declarations of defendant: Under the rules of *res gestae* and the case of *State* v. *Tighe,* 27 Mont. 327, 71 Pac. 3, the acts of defendant soon after the shooting, the occasion therefor, and the declarations, *etc.,* should have been received in evidence.

Decedent's habit of carrying weapons: "On a plea of self-defense, it is always relevant for the accused to show that the deceased was in the habit of carrying weapons, or that he had the reputation of being habitually armed." (Wharton's Criminal Evidence, sec. 927; *Naugher* v. *State,* 116 Ala. 463, 23 South.

26; *Daniel* v. *State,* 103 Ga. 202, 29 S. E. 767; *State* v. *Graham,* 61 Iowa, 608, 16 N. W. 743; *Riley* v. *Commonwealth,* 94 Ky. 266, 22 S. W. 222; *King* v. *State,* 65 Miss. 576, 7 Am. St. Rep. 681, 5 South. 97; *State* v. *Yokum,* 14 S. D. 84, 79 N. W. 389; *Glenewinkel* v. *State* (Tex Cr. App.), 61 S. W. 123; *State* v. *Crawford,* 31 Wash. 260, 71 Pac. 1030.)

Mitigation of punishment and disproof of malice: Where the jury is given a certain discretion in fixing the punishment of the defendant in case of conviction, evidence, though otherwise incompetent, may be admissible to mitigate the punishment. Section 9329 *et seq.,* Revised Codes, empowers the jury to assess the punishment. The effect of these statutes is to render evidence of mitigating circumstances admissible, which would have been inadmissible or unavailing at the common law. (*Fletcher* v. *People,* 117 Ill. 184, 7 N. E. 80; *Nowacryk* v. *People,* 139 Ill. 336, 28 N. E. 961; *Fields* v. *State,* 47 Ala. 603, 11 Am. Rep. 771.)

*Mr. D. M. Kelly,* Attorney General, and *Mr. Louis P. Donovan,* Assistant Attorney General, for Respondent, submitted a brief; *Mr. Donovan* argued the cause orally.

Since the evidence of threats would be admissible only in the event that the issue of self-defense was raised, the court could properly prevent counsel from making a statement concerning such previous threats by the deceased until he had first made a statement of facts showing that evidence of the threats would be admissible. (6 Ency. of Evidence, 789–792, and cases cited.) While counsel took an exception to the remarks of the court, he did not state that his exception was based upon the ground that the remarks of the court were improperly made in the presence of the jury. He should not now be permitted to urge an alleged error which was not specifically pointed out to the trial court. (*State* v. *Tully,* 31 Mont. 365, 73 Ann. Cas. 824, 78 Pac. 760; *State* v. *Biggerstaff,* 17 Mont. 510, 43 Pac. 709.) So far as the remarks of the county attorney are concerned, they do not constitute reversible error for three reasons,—(a) the objections are well founded (6 Ency. of Evidence, 789–792); (b)

there was no request by the defendant that the jury be instructed by the court to disregard these interruptions by the county attorney (*State* v. *Biggerstaff, supra*) ; and (c) it does not appear that the defendant was prejudiced thereby. (*People* v. *Amer,* 8 Cal. App. 137, 96 Pac. 401.)

Threats: The statement of the deceased to Blomberg, as contained in the defendant's offer of proof, was a mere narration by the deceased of a past event, and not a threat. (6 Ency. of Evidence, 784.) Furthermore, there was not any ruling upon the offer of proof, nor any exception taken thereto; hence there is nothing for the supreme court to review. (*State* v. *Biggs,* 45 Mont. 400, 123 Pac. 410; 2 Cyc. 722.) Blomberg later testified to the whole conversation regarding which this question was asked. The defendant, therefore, suffered no prejudice. (*State* v. *Van,* 44 Mont. 374.)

The alleged threat contained in the Dagen offer of proof was conditional upon catching the person in the act of herding cattle off the land—a condition which does not appear to have happened—and consequently the alleged threat was not admissible in evidence for any purpose. (6 Ency. of Evidence, 785; *Harbour* v. *State,* 140 Ala. 103, 37 South. 330.)

The remarks of the court regarding the inadmissibility of uncommunicated threats were made in excluding certain letters that were plainly inadmissible, for the reason that they were hearsay and irrelevant. Since the ruling of the court in excluding these letters was correct, it is immaterial that the court may have given a wrong reason therefor, or may have indulged in conversation irrelevant to the ruling. (*McCauley* v. *Jones,* 35 Mont. 32, 88 Pac. 572.)

Decedent's habit of carrying weapons: There is no evidence in the transcript tending to show that the defendant had any knowledge of any habit on the part of the decedent of carrying weapons upon his person, or keeping a rifle in the barn. His only knowledge in regard thereto is found in the single instance when he met the decedent the day of the alleged holdup. Habit cannot be proved by showing a single isolated act (11 Ency.

of Evidence, 797), and a habit which was unknown to the defendant would be immaterial. (6 Ency. of Evidence, 770.)

Mitigation of punishment and disproof of malice: The decisions cited by the defendant in support of this portion of his argument are readily distinguished from the case at bar. The declarations by the courts in these cases apparently have application only to jurisdictions where the statute requires the jury to fix the punishment. Furthermore, evidence of the defendant's education, occupation and the age of his mother, would not in our opinion have any bearing upon the degree of turpitude of his act within the rule announced in cases cited by appellant. In the case at bar the jury did not assess the punishment. And even where the jury does assess the punishment the court may reduce the extent or duration thereof. It therefore appears that under our statute these matters, which do not bear upon the guilt or innocence of the defendant but may have a bearing upon the degree of turpitude of his act, can be properly presented to the court at the time sentence is passed (secs. 9369, 9370, 9333, Rev. Codes), and therefore, there appears no necessity for presenting them to the jury. (*Gardner* v. *State,* 90 Ga. 310, 35 Am. St. Rep. 202, 17 S. E. 86; 6 Ency. of Evidence, 799.)

Refusal to modify Instruction No. 20: The jury was fully and correctly instructed in regard to previous threats by the deceased in instructions 34 and 35. These instructions were requested by the defendant, and the defendant cannot, therefore, claim that they do not correctly state the law. It is not necessary that the whole law of the case be stated in a single instruction, and if the jury is correctly charged in other instructions the defendant cannot complain. (*State* v. *Byrd,* 41 Mont. 585, 111 Pac. 407; *State* v. *Van, supra.*)

MR. JUSTICE SANNER delivered the opinion of the court.

The appellant, Walter Whitworth, was convicted of the crime of murder in the second degree and sentenced to imprisonment for life. From the judgment of conviction and from an order denying his motion for new trial he appeals. Reliance is placed

in twenty-five specifications of alleged error, involving some fifty-odd rulings by the trial court. We have considered them all; many were manifestly correct; others were of no apparent consequence; still others, for lack of proper record, are not reviewable here. Under the rule established in this state, that [1] this court will be controlled in the disposition of appeals by considerations of substance and not mere technicality, we shall advert only to those rulings, properly presented, by which some substantial right of the appellant appears to have been erroneously and prejudicially affected.

1. The appellant sought to justify the homicide upon a plea [2] of self-defense. Besides giving his version of the homicide and his reasons therefor, he also testified that on the day of the homicide he was and for many months had been a ranch foreman in the employ of the Gillette Company; that on the morning of April 26, 1911, five days before the homicide, while he, unarmed, was driving his employer's wagon near one of the gates in the neighborhood, the deceased, armed with a rifle, overtook him, "threw down" on him, saying, "You are the son-of-a-bitch I am looking for this morning," cocked the rifle, pointed it at him, menaced him with it, several times threatening to kill him, on account of some cattle and horses belonging to Levin Brothers that had been turned out of one of the Gillette Company fields; on Whitworth suggesting that there were laws in the country available to the deceased if wrong had been done, deceased replied that his gun was law on Flat creek and Whitworth would have to abide by that; that at the point of the rifle deceased compelled Whitworth to promise to return the horses and to notify deceased of their return, and also compelled Whitworth to promise that he would resign his place with the company and leave the country; that at the close of the interview, deceased said: "Now remember, this Winchester is with me all the time and it is for you especially, and if you don't bring them horses back I am going to kill you; if I don't have this Winchester, I will have this," reaching into his hip pocket and drawing out a revolver.

To rebut this narrative, the state called Andy Levin, who was a brother of deceased and with him made up the firm of Levin

Brothers. Andy Levin testified that he knew his brother intended that morning to see Whitworth about the horses that had been driven away, and, being anxious, followed deceased away from the house some time after; that he saw the entire encounter from a distance of about 300 yards; that the deceased did not at any time point his rifle toward Whitworth but kept it at all times in the hollow of his arm; that they talked for ten or fifteen minutes, finally clasped and held hands "for more than a minute," and separated without any visible demonstration of hostility having been made. Whereupon, after some cross-examination along other lines, appellant's counsel asked leave to and offered to cross-examine the witness Andy Levin for the purpose of eliciting that on April 28, two days after the encounter referred to, the witness met Frank Adams, another employee of the Gillette Company, with one Robard, and engaged Adams in conversation about the horses that had been driven out of the Gillette Company field, demanding that in future he be notified of any horses or cattle the Gillette employees might see in his fields, and he would come and get them; that on Adams replying, "Our men would drive them out," the witness became abusive and said, they, referring to deceased and himself, would "kill any son-of-a-bitch they found driving horses out of the company's field, and that Whitworth had promised Adolph to bring back those horses, and if he did not do so it would not be healthy for him." This offer was objected to by the state and refused by the court. We think that cross-examination along the lines suggested should have been allowed and that its refusal was substantial error. "The purpose of trials of issues of fact is to bring out the whole truth, and to that end the right of cross-examination must be liberally interpreted and freely exercised. * * * Properly understood, the right extends, not only to all facts stated by the witness in his original examination, but to all other facts connected with them, whether directly or indirectly, which tend to enlighten a jury on a question in controversy." (*Cobb* v. *Hecklen*, 27 Mont. 245, 263, 70 Pac. 805.) Necessarily included in this broad statement is the credi-

bility of the witnesses; and in view of its character it was important for the jury to know just what weight should be given to the testimony of Andy Levin. If the conversation referred to in the offer occurred, it was relevant and material evidence touching the verity of his account of the meeting between deceased and Whitworth on April 26; touching the attitude of himself and the deceased as one of hostility toward the appellant prior to and at the time of the homicide, and touching his own animus as a witness at the trial. If the witness admitted the conversation, such inferences therefrom as are valid would have at once obtained; if he denied it, the way would have been opened for contradictory evidence by the persons who heard his statements. (*State* v. *Hanlon,* 38 Mont. 557, 100 Pac. 1035.)

2. The appellant Whitworth at the time of the homicide was thirty-four years old, five feet and six inches in stature, and [3] weighed about 157 pounds. The deceased was younger, six feet and three or four inches tall, weighed from 200 to 220 pounds, without superfluous flesh, broad-shouldered, well-proportioned, well-muscled,—"apparently a very strong, muscular, robust man." He had been shot four times; in the thigh, in the left hand and wrist, in the left arm and in the left breast. The last-mentioned shot entered just above the nipple, pierced the lung and base of the heart and caused almost, if not quite, instantaneous death. On behalf of the state there was evidence which tended to show that on the morning of the homicide, the deceased was plowing with a sulky-plow and four horses; that Whitworth rode up and commenced to shoot while the deceased was still upon the plow, engaged in managing the horses attached thereto, and without any demonstration or manifestation of hostility having been made by the deceased; that the deceased quit the plow, was followed by Whitworth, who kept on shooting, and that Whitworth fired one shot after the deceased had fallen to the ground. The defendant testified, in effect, that while pursuing his way along the road upon his employer's business, he saw deceased plowing and rode up to him for the purpose of explaining that he (Whitworth) could not keep the promises exacted of him by deceased on April 26 and to request the de-

ceased to take up the matter with Mr. Reeder; that when he got within speaking distance the following occurred: "I says, as usual, 'Good morning, Adolph.' He didn't say good morning. I said, 'Adolph, I would like to speak to you in regard to the trouble we had last Wednesday, and it is a matter that we cannot settle within ourselves.' I says, 'I want you to go to Mr. Reeder and settle it with Mr. Reeder. I am acting under his instructions,' and I says, 'Furthermore, I cannot do what I promised you I would do; I cannot bring them horses back.' He says, 'You haven't brought them horses back?' and I said, 'No.' 'Furthermore,' I says, 'I don't intend to.' He says, 'You and I will settle it'; he says, 'I will kill you.' When he was off the plow he throwed his hand behind him and started toward me. I got my gun as quick as I could and fired twice as quick as I could; my horse reared and swung to the left with my back to Levin; I looked around over my shoulder and he was still coming. I fired twice more and the last shot that was fired I thought that I had wounded the man; I couldn't tell from any action that he made before that whether I had touched him at all or not. I did not fire at him after he got past me. * * * Q. Mr. Whitworth, as Levin started towards you, having put his hand toward his hip pocket, why did you shoot? A. I was sure the man was going to kill me there and then. * * * I saw Mr. Levin fall to the plowed ground. After I fired the last shot he went twenty-five or thirty paces."

Alvin Johnston, a witness for the state, also testified: "I saw Whitworth riding up and he rode up to where Levin was plowing and Levin stopped, and they talked probably a minute, and Levin got off the plow and throwed his right hand behind him and Whitworth drew his gun and commenced firing."

Whatever may be one's personal impression of Whitworth's story, it is clear from the above that a controversy existed as to who was the aggressor, as to whether there was on the part of the deceased an overt act or demonstration sufficient to induce a reasonable fear in the defendant for his personal safety, and as to whether the defendant did in fact kill the deceased under

the influence of such fear alone.    To throw such light as he might upon this controversy, the defendant sought in divers ways— generally unsuccessful—to show threats by the deceased directed toward the defendant, but made out of his presence.    It is unnecessary to recite all of these.    The following illustration will suffice: Stephen Dagan, a witness for the defendant, was asked whether on April 8, 1911, he overheard any conversation between Adolph and Andy Levin with reference to any threats or difficulty with Whitworth.    Objection by the state was sustained and thereupon the following offer of proof was made and refused: "The defendant now offers to prove by the witness Stephen Dagan testifying on the stand, and another witness, that they overheard a conversation on the evening of April 8, 1911, between the deceased, Adolph Levin, and his brother, Andy Levin; that said conversation occurred in the evening of said day, and that Andy told Adolph about a piece of land, and said that he had some talk with Reeder that afternoon at the Coulee ranch; the land referred to being that of a Mr. Hansen's. Reeder had stated to Andy Levin that he thought he had the lease, and Andy Levin thought that he had the lease.    Thereupon Mr. Reeder called Andy Levin back from Reeder's house, Andy Levin was leaving, and said, 'I have here the man who will tell you who has the lease on that land,' and thereupon Whitworth came forward and showed Andy Levin the lease which he, Whitworth, had obtained from Hansen.    Thereafter Andy Levin discussed with Adolph Levin the matter of horses and cattle being driven away from the Levin Bros. ranch.    Andy said: 'The first man of Gillette's that he ever catched herding cattle or horses off his land he would kill him.'    And Adolph said: 'That it wouldn't make any difference who it was, we will fix him, and if I do catch one of them, I will see that he don't do it again.'    Adolph further said, referring to one of the Gillette Company employees, or Gillette's foreman: 'If I ever catch that fellow again, I will make him dance.' "

As we infer from the record, the views of the learned trial judge were: that communicated threats are admissible only "as a moving influence in the apprehension of the defendant"; that

uncommunicated threats are inadmissible, or if admissible at all, then not until there has been sufficient evidence independent of them to create the inference of self-defense, for which purpose something more than the defendant's statement should be required; and that threats—communicated or not—have no value in determining whether the deceased was the aggressor in the fatal affray. The law has been settled otherwise in this state. Over eleven years ago this court, discussing an instruction in a similar case, said: "It told the jury, in effect, that the threats were not pertinent to the consideration of the question whether or not the defendant was actually assailed or as a reasonable man believed himself in danger of great bodily injury or in peril of life at the hands of the decedent; in other words, that the prior threats of the decedent were not to be considered unless and until the evidence disclosed that the homicide was committed in necessary self-defense.  *  *  *  Such is not the law. Evidence of threats made by the decedent against the defendant, and communicated to him, was admissible in the latter's favor as tending to characterize the acts and conduct of the decedent and of the defendant at the time of the killing.  *  *  *  Evidence of prior threats should be considered with, not apart from, the conduct and acts of the decedent, as well as of the defendant.  *  *  *  Threats of the decedent against the defendant which had not been communicated to the latter, were admissible for the purpose of indicating or tending to show that the decedent brought on the conflict or was the aggressor or assailant, and that the defendant acted in necessary self-defense.  *  *  *  While prior threats of the decedent against the defendant, whether communicated or not, are inadmissible in justification unless at the time of the killing the decedent indicated by his conduct an intention to carry them into execution, evidence that they were made is relevant and material wherever there is any evidence tending to show such conduct or to prove that the decedent was the assailant at the time of the homicide." (*State* v. *Shadwell*, 26 Mont. 52, 66 Pac. 508.)

In *State* v. *Felker*, 27 Mont. 451, 461, 71 Pac. 668, the above principles were restated with this comment: "The controversy

as to who was in the wrong can be correctly determined only by revealing to the jury, so far as may be, the exact relations, actions and intentions of the parties to the affray, so that the jury may give due weight to every fact which influenced the mind of the defendant.''

It is suggested by the attorney general that the particular [4] offer above quoted was inadmissible because the threats referred to were not specifically directed toward the defendant and because they were conditional upon catching the person in the act of herding cattle off the land, a condition which does not appear to have happened. We think this evinces a misapprehension of the scope and probative value of such threats if made. The fact that they are vague, indefinite and conditional is no bar to their admission. (*State* v. *Sloan,* 22 Mont. 293, 300, 56 Pac. 364.) The evidence offered, if true, manifests a hostile and aggressive state of mind in each of the Levin brothers, not only toward the employees of the Gillette Company, of whom the defendant was one, but toward the defendant as an individual. If its existence was known to him, it would amount to a constant threat communicated to him; if not, its existence would reflect the attitude of mind entertained by the deceased and throw light on the question as to who was the aggressor at the time of the homicide. (*State* v. *Hanlon, supra.*)

3. Complaint is made of the giving of certain instructions and of the refusal of certain others proposed by the defendant. It is contended here that the instructions, so far as they make any reference to the matter of previous threats, reflect the views of the trial judge as disclosed in the taking of the testimony. Instruction 20, which deals especially with the evidentiary scope and value of prior difficulty and threats, does apparently fall short of announcing the rule as above stated. Whether this be more apparent than real, the trial court will doubtless be more explicit at another time. In any event, neither as to this nor the other instructions complained of were specific objections of the right kind made in the trial court, so that matter needs no further attention.

We see no error in the refusal of defendant's proposed instruction No. 25.

The judgment and order appealed from are reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY concurs.

MR. JUSTICE HOLLOWAY did not hear the argument and takes no part in the foregoing decision.