STATE, RESPONDENT, *v.* JONES, APPELLANT.

(No. 3,297.)

(Submitted February 5, 1914. Decided February 24, 1914.)

[139 Pac. 441.]

*Criminal Law—Homicide—Self-defense—Character Evidence— Photographs—Instructions—Trial — Irresponsive Answers — Evidence—Objections—Practice.*

Criminal Law—Trial—Evidence—Irresponsive Answer—When Harmless Error.
1.   Though refusal to strike out an irresponsive answer in which the witness volunteers a statement of facts from which the complaining party has probably suffered prejudice will result in a reversal of the judgment, such refusal *held* harmless error where the objectionable statement was volunteered on cross-examination after having been twice before made on his direct examination.

Same—Character Evidence—Rebuttal—What Inadmissible.
2.   Where a defendant on trial for crime calls witnesses to testify to his good character in the community in which he resides, cross-examination as to their knowledge of disparaging rumors affecting his reputation is proper, but evidence showing particular acts of lawlessness committed by the defendant is inadmissible for the purpose of rebutting testimony tending to show his good character.

[As to weight of evidence of good character of defendant in criminal case, see note in Ann. Cas. 1913E, 16.]

Same—Attorneys—Misconduct—Questions Assuming Facts.
3.   The putting of questions to witnesses in a criminal prosecution which assume the existence of facts derogatory to the character of

defendant, and inadmissible if offered as independent evidence, constitutes gross misconduct on the part of the prosecuting attorney.

Same—Trial—Evidence—Objections—Practice.

4.   Where objection to evidence of a certain character has once been made, it is not incumbent upon counsel, nor proper, to constantly repeat the same objection to like evidence by other witnesses.

Same—Homicide—Self-defense—Evidence—Reputation of Deceased.

5.   In a trial for homicide, where the issue is self-defense, evidence of the reputation of the deceased as a man of a turbulent and violent character (even though unknown to the defendant at the time of the killing) is admissible to aid the jury in solving the question as to who was the probable aggressor.

[As to admissibility of evidence of character or reputation of deceased in homicide case, see note in 134 Am. St. Rep. 726.]

Same—Evidence—Photographs—Admissibility.

6.   After a photograph has, by the evidence of the person who made it or of any competent witness, been shown to be a fair and correct representation of one whose identity is in question, it is admissible as a means of identifying him.

Same.

7.   *Held*, under the rule declared in paragraph 6, *supra*, that error was committed in excluding a photograph claimed by defendant to represent deceased, together with depositions of the warden of a state prison and others to the effect that the person thus pictured was that of one J., a man of a violent disposition, as well as in rejecting an offer of testimony, by witnesses who knew deceased, to identify the photograph as his, even though it incidentally appeared therefrom that deceased was an ex-convict.

[As to admissibility of photographs as evidence, see notes in 75 Am. St. Rep. 468; 114 Am. St. Rep. 437.]

Same—Instructions—Reasonable Doubt—"Should"—"Must."

8.   Instructions to the jury to the effect that before they could convict defendant of the crime of murder in the first degree they "should" be satisfied of his guilt beyond a reasonable doubt, *etc.*, and that they "should" (instead of "must") acquit him unless they were so satisfied, *held*, not reversible error.

[As to instructions concerning reasonable doubt, see note in 48 Am. St. Rep. 566.]

Same—Instructions—Manslaughter.

9.   Where under the evidence the defendant was either guilty of murder or not guilty because the homicide was done in self-defense, it was improper to instruct that "no provocation by words only, however opprobrious or threatening, will  *  *  *  reduce the killing to manslaughter," since there was not any evidence to which the instruction could apply.

Same—*Quantum* of Proof—Improper Instructions.

10.   The giving of an instruction, the effect of which was to permit the jury to weigh the evidence in a prosecution for homicide, under the rule applicable to civil cases as to the *quantum* of evidence necessary to prove a fact, was error.

*Appeal from District Court, Lewis & Clark County; J. M. Clements, Judge.*

WILLIAM JONES, convicted of murder in the first degree, appeals from the judgment and an order denying his motion for a new trial. Reversed and remanded.

*Messrs. C. A. Spaulding,* and *Homer G. Murphy,* for Appellant, submitted a brief; *Mr. Spaulding* argued the cause orally.

Refusal to permit counsel for the defendant to cross-examine the witness Davis, by requiring such witness to indicate upon counsel the manner in which the first shots exchanged between defendant and deceased were fired, was error. Undoubtedly a clearer idea is conveyed of how swiftly another moved under certain circumstances if the witness illustrates the movement than if he should testify merely that the person "moved swiftly." Such illustrations by a witness have received and should receive the approval of courts of justice. They stand, as was said by the court of criminal appeal of Texas, on the same footing as maps and diagrams. (*Black* v. *State,* 46 Tex. Cr. 590, 81 S. W. 302; *State* v. *McGann,* 8 Idaho, 40, 66 Pac. 823; *People* v. *Maughs,* 149 Cal. 253, 86 Pac. 187.)

The question asked on the cross-examination of the witness Baker assumes and states as a fact that appellant at some time went up to the Castle to beat up a woman. Of course, it was never in evidence that he did at any time go up to the Castle to beat up a woman; nor could it be put in evidence by the state, for to do so would violate the elementary rule that specific acts of violence on the part of a defendant charged with a crime are not competent as evidence of his general reputation for being a quarrelsome or peaceable person. (*McCarty* v. *People,* 51 Ill. 231, 99 Am. Dec. 542; *Gifford* v. *People,* 87 Ill. 210; *Hirschman* v. *People,* 101 Ill. 568; *Moulton* v. *State,* 88 Ala. 116, 6 L. R. A. 301, 6 South. 758; Wharton's Criminal Evidence, sec. 61.) Under the authorities it cannot be doubted that it was improper to permit a question to be propounded in the very objectionable form indicated. The rule is firmly established that it is improper to ask on cross-examination any question embracing a statement of fact not in evidence. (3 Wigmore on

Evidence, 2344; *People* v. *Mather,* 4 Wend. (N. Y.) 229, 21 Am. Dec. 122; *Carpenter* v. *Ambroson,* 20 Ill. 170; *Yount* v. *Strickland,* 17 Wyo. 526, 101 Pac. 942; *State* v. *Parker,* 172 Mo. 191, 72 S. W. 650; Jones on Evidence, sec. 843; *State* v. *Gleim,* 17 Mont. 17, 52 Am. St. Rep. 655, 31 L. R. A. 294, 41 Pac. 998; *People* v. *Un Dong,* 106 Cal. 83, 39 Pac. 12; *State* v. *Crowe,* 39 Mont. 174, 18 Ann. Cas. 643, 102 Pac. 579; *People* v. *Derbert,* 138 Cal. 467, 71 Pac. 564; *Spencer* v. *Commonwealth,* 32 Ky. Law Rep. 880, 107 S. W. 342; *People* v. *Lee Chuck,* 78 Cal. 317, 20 Pac. 719; Wharton's Criminal Evidence, sec. 61.)

The repeated rulings of the trial court regarding the admission of the photograph of deceased in evidence, and its identification as a photograph of the deceased, constitute reversible error. It is elementary that one charged with homicide who claims to have acted in self-defense is entitled, as a matter of right, to prove, if he can do so, that his adversary was a person whose general reputation for peace and quiet was bad. (McClain on Criminal Law, sec. 307; *State* v. *Shafer,* 22 Mont. 17, 55 Pac. 526.) This appellant sought to do by showing that the ex-convict mentioned in the deposition of Snook was the person with whose killing appellant stood charged. That a photograph of a person is admissible in evidence without preliminary proof from the photographer, see *State* v. *Roberts,* 28 Nev. 350, 82 Pac. 100. Photographs are always competent and admissible when identified by any witness as correct representations of persons or places. (McClain on Criminal Law, sec. 406; Underhill on Criminal Evidence, 62, 63; *People* v. *Durrant,* 116 Cal. 179, 48 Pac. 75; *Mow* v. *People,* 31 Colo. 351, 72 Pac. 1069; *Ruloff* v. *People,* 45 N. Y. 213; *People* v. *Mahatch,* 148 Cal. 200, 82 Pac. 779; *People* v. *Grill,* 151 Cal. 592, 91 Pac. 515; *State* v. *McCoy,* 15 Utah, 136, 49 Pac. 420.)

The following instruction was given: "You are instructed that no provocation by words only, however opprobrious or threatening, will mitigate an intentional killing, so as to reduce the killing to manslaughter." By it the jury were in effect told that even if, as a fact, there was at the time of the homicide a

"sudden quarrel or heat of passion," still, if that quarrel or heat of passion was engendered in a particular manner, appellant was, notwithstanding, guilty of murder. This was error. (*Lynn* v. *People,* 170 Ill. 527, 48 N. E. 964; *State* v. *Buffington,* 71 Kan. 804, 4 L. R. A. (n. s.) 154, and note, 81 Pac. 465; *State* v. *Grugin,* 147 Mo. 39, 71 Am. St. Rep. 553, 42 L. R. A. 774, 47 S. W. 1058; *Commonwealth* v. *Hourigan,* 11 Ky. Law Rep. 509, 12 S. W. 550; *State* v. *Hudspeth,* 150 Mo. 12, 51 S. W. 483; *Massie* v. *Commonwealth,* 16 Ky. Law Rep. 790, 29 S. W. 871; *Stott* v. *Commonwealth,* 17 Ky. Law Rep. 308, 29 S. W. 141; *State* v. *Matthews,* 148 Mo. 185, 71 Am. St. Rep. 594, 49 S. W. 1085; *Findley* v. *State,* 125 Ga. 579, 54 S. E. 106.)

*Mr. D. M. Kelly,* Attorney General, and *Mr. J. H. Alvord,* Assistant Attorney General, submitted a brief in behalf of Respondent.

Where a plea of self-defense is made, the general reputation of the deceased for violence and turbulence may be shown as a part of the defense for two distinct purposes: (1) To show the reasonableness and degree of defendant's apprehension of injury from the deceased's threatening acts or demonstrations during the difficulty; and (2) as bearing upon deceased's state of mind and the question of whether or not he was the aggressor. (6 Encyclopedia of Evidence, 771; Wharton on Homicide, 3d ed., 429.) But for either of these purposes such evidence is not admissible unless the reputation of deceased for quarrelsomeness and turbulence is first shown to have been known to the accused. (Wharton on Homicide, 3d ed., sec. 263.) No such testimony was introduced. Hence any offering of proof as to deceased's reputation was premature and immaterial, and there was no error in excluding the photograph attached to the deposition offered but excluded. Besides, it is to be noticed in this regard that several matters important to be shown were entirely left out of the deposition. They were, (1) that deponent saw the photograph taken; (2) that deponent knew when it was taken; (3)

that deponent knew by what means it was made; and (4) that deponent knew by whom it was made.

Grievous reproaches or opprobrious words will not be regarded as a provocation sufficient to arouse in a reasonable man a sudden heat of passion required to reduce an otherwise murderous homicide to manslaughter; such is, we think the real meaning of the rule. It has been thus applied in California, which state defines manslaughter exactly as it is defined by our Code: "Words, however grievous, do not reduce a homicide from murder to manslaughter." (*People* v. *Lynch,* 101 Cal. 229, 35 Pac. 860.) "Sudden heat of passion must have been caused by a serious and highly provoking injury, apparently sufficient to have aroused an irresistible impulse to kill. Such an impulse would exclude the idea of premeditation." (*People* v. *Mendenhall,* 135 Cal. 344, 67 Pac. 325; *People* v. *Freeland,* 6 Cal. 96; *People* v. *Hurtado,* 63 Cal. 288.)

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

The defendant was convicted of murder in the first degree and sentenced to imprisonment for life. He has appealed from the judgment and the order denying his motion for a new trial. The integrity of the judgment is assailed on the ground that prejudicial error was committed by the court in its rulings upon questions of evidence and in submitting instructions to the jury. Contention is also made that the court permitted such misconduct by the county attorney that the defendant was prevented from having a fair trial. The defendant admitted the homicide and undertook to justify it on the ground of self-defense.

The encounter resulting in the homicide occurred in the early (Sunday) morning of March 31, 1912, in a saloon known as the Manhattan Club, at the head of Joliet street in the city of Helena. The place was kept by the deceased, Robert Johnson, and one Ward Cole, both negroes, and was a popular resort among a certain class of colored people. On the evening of the 30th a visit was made to it by several persons with the purpose

of promoting the interests of candidates for election to office at the approaching city election. The deceased, who had charge at the time, asked the defendant to go out and invite in colored men from other places. This he did. There was then some discussion by speakers as to the merits of the parties represented by them and their candidates, during which beer and other refreshments were served at the expense of the visitors. The defendant asked to be served with beer. He was told by deceased that he could get a glass of beer by paying for it. The defendant remonstrated, calling the attention of deceased to the fact that the drinks were free and that he (defendant) had accommodated deceased in various ways during the evening, especially by going to invite in a crowd at the request of the latter, but remonstrance was fruitless. The result was an altercation during which vile epithets were exchanged and a fight was narrowly averted. Finally the deceased ordered the defendant from the place. He did not go at once but waited until the meeting adjourned. He then went, after using threats against the deceased. This was about 11 o'clock. Having walked about the streets for some minutes and visited other places in the neighborhood, he went to the saloon of a friend and borrowed a revolver with which the killing was done, explaining to his friend that he going out early in the morning with another friend to shoot rabbits. This intention he mentioned to others also. The revolver was not then loaded, but the defendant, having some cartridges of suitable caliber, went to his room and obtained them and after loading the revolver, put it into his pocket. One witness testified, substantially, that he met the defendant on the street in the vicinity of the Manhattan Club; that the defendant referred with feeling to the treatment he had received at the hands of the deceased; that when the witness parted with the defendant, the latter invited him to go to the Manhattan Club, saying that he was going to have it out with the deceased, and that "they would either carry him out dead or Johnson out dead." The witness refused to go. Some minutes later the defendant entered the resort. There was then

present, besides the deceased, one John Davis, who was the only
eye-witness, other than defendant, as to what was the order of
events immediately preceding the homicide. We shall not state
the testimony in detail. Davis stated that when the defendant
entered he referred to the episode of the evening before and
remonstrated with the deceased; that the deceased refused to
discuss the matter, telling the defendant that the incident was
closed and that he should go out; that he himself interposed by
suggesting that life is too short to permit worries over such small
affairs; that he invited the defendant and deceased to have a
drink at his expense and advised them to forget their differ-
ences; that the deceased then gave the defendant a twenty-five
cent piece; that the defendant bought a drink; that when this oc-
curred the witness thought the deceased and defendant had be-
come friendly again; but that immediately thereafter while he
was apparently waiting for deceased to serve him a cigar, the
defendant shot the deceased. He stated that when the defend-
ant began to shoot he hurried from the place, but as he passed
out he saw the deceased fall. The story of the defendant is in
substantial agreement with that of Davis, except as to who
ordered the drinks and except, also, as to who was the aggressor.
According to his story, he himself ordered the drinks inviting
Davis to join him. He stated that Davis declined the invitation
saying that he did not drink; that he then ordered a drink of
whisky for himself, putting a twenty-five cent piece upon the
bar; that after he had taken the drink and as he was returning
the glass to the bar, the deceased reached over with his left hand
and struck him, knocking off his hat, which fell behind the bar;
that he stepped back to avoid further assault and demanded the
return of his hat; that the deceased, applying to him a vile epi-
thet and saying, "I will give you your hat," raised a revolver
and shot him in the abdomen; that he then drew his revolver and
began firing; that the deceased attempted to continue firing but
that his revolver seemed to "hang"; that the deceased turned
as if to secure another weapon; that the defendant thereupon
hurried from the place leaving his hat and calling for the police,

without, however, he stated, having seen the result of the shooting. An autopsy disclosed that deceased had been shot four times, one shot passing entirely through the brain cavity from the left temple and lodging under the scalp on the opposite side of the head. The other wounds were not mortal, but this was and was of such a character as to destroy the power of muscular control and must have caused the deceased to fall as soon as it was inflicted. As defendant left the scene of the shooting and in answer to an inquiry by a witness whom he met on the street as to what was the matter, he stated that he had been shot by Johnson and that he was going to a hospital for medical aid. He did not go to a hospital nor to the police station as he was advised to do by the witness, but went first to the saloon at which he procured the pistol and returned it. He there exhibited to the proprietor a flesh wound in his abdomen, a bullet dropping out as he opened his clothes. He stated that he believed that he had killed "that fellow," without explaining whom he referred to. From there he went to different places, finally going to his rooming-house, where he was later arrested, apparently in hiding in an outhouse.

There was evidence that prior to his return to the Manhattan Club the defendant made other threats against the deceased. One witness stated that while he was at a place kept by one Silverman, where the defendant had his room, the defendant came in and, giving the proprietor his keys, asked him to take care of his dog and other property there. Upon being asked what he was going to do he said that "he was going to kill that black s—— o—— b——." The witness had been present at the Manhattan Club when the altercation occurred there. Other witnesses testified to similar threats made at different places visited by the defendant prior to the homicide. The defendant denied making any threats at all, and accounted for his return to the Manhattan Club by the statement that he knew that the barber-shops did not close on Saturday evenings until about midnight; that the club was supported by the men that worked in the barber-shops; that his purpose on returning to the club was to meet them, and that he had no idea of having trouble with

the deceased. The body of the deceased was found lying between the front and back bars, near the end leading from the front into the space between. In the right hand was a revolver containing two cartridges, one of which had been recently exploded. This brief *résumé* of the evidence shows that it was in sharp conflict on every material point.

If we accept the story of the encounter as told by the witness Davis, keeping in mind the antecedent threats of the defendant and his procuring the revolver with the apparent purpose of carrying them out, we are compelled to the conclusion that the defendant was properly found guilty as charged. On the other hand, accepting his own story as the correct version of the encounter, the homicide was justifiable because done in necessary self-defense. There is not ground for any other than one of these two conclusions.

Counsel for defendant have assigned and discussed in their brief many alleged errors which are wholly without merit; so much so that we cannot think counsel serious in urging them. For example: The witness Harry Johnson during cross-examination [1] was questioned as to what he heard the defendant say about the deceased at Silverman's saloon a short time before the homicide. He was questioned and answered as follows: "Q. You didn't say a word to him? A. I asked him where he was going. Q. Is that all you said to him? A. He told me that he going to kill that s—— o—— b—— and I laughed at him." Counsel asked to have the answer stricken out as not responsive to the question. The court overruled the motion. A party is entitled to have a responsive answer to a question propounded to a witness by counsel (Jones on Evidence, sec. 815; Underhill on Criminal Evidence, 2d ed., sec. 216), and to have an answer stricken out in which the witness volunteers statements of facts not called for by the question. The refusal of the trial judge to strike out such an irresponsive answer is error, and, if it appears that the evidence embodied in it has probably wrought prejudice to the party complaining, the result will be the reversal of the judgment. The ruling in

question was erroneous but clearly not prejudicial, for the reason that during his examination in chief the witness twice imputed to the defendant the threat embodied in the irresponsive answer, using almost the exact words employed by him in the latter. The statement was relevant, was already in the case, and the repetition of it by the witness could not from any point of view have wrought prejudice. A judgment may not be reversed for such an error. (Rev. Codes, secs. 9415, 9548; *State* v. *Vanella,* 40 Mont. 326, 20 Ann. Cas. 398, 106 Pac. 364; *State* v. *Byrd,* 41 Mont. 585, 111 Pac. 407.) We shall, therefore, omit notice of all the assignments which may properly be classed under this head, and give attention to those only which have some basis of merit.

Henry Baker was called to testify as to the reputation of the defendant for peace. He testified that it was good. On cross-[2, 3] examination by the county attorney he was asked: "Did you ever hear about the episode at the Castle when he went up there to beat up a woman?" Objection was made that the question embodied a statement of fact which could not be proved by independent evidence, *viz.,* that the defendant had at some prior time gone up to the Castle (a notorious resort in Helena) to beat a woman, and that the county attorney in putting the question in this form in effect stated to the jury that such an episode had in fact occurred, whereas he would not have been permitted to show it by independent evidence. The county attorney thereafter called other witnesses to whom he put the same question or others similar in form, touching this and other alleged unlawful acts of the defendant. The court overruled the objection. Thereupon the witness answered in the negative. It is argued that the ruling was prejudicial for the reasons stated in the objection, and for the additional reason that in thus putting the question the county attorney was guilty of gross misconduct on account of which alone the defendant ought to be awarded a new trial.

It will be noted that the objection did not technically present the question whether the county attorney was guilty of misconduct. We gather from the colloquy between the presiding judge

and counsel that the judge was of the opinion that it would be competent for the county attorney to introduce independent evidence of special instances of lawlessness by the defendant, to rebut the evidence tending to show his good reputation. The rule is well settled that when a defendant in a criminal case calls witnesses to testify that he possesses such a general reputation in the community in which he resides as tends to rebut the notion that he is guilty of the crime with which he is charged, these witnesses may be questioned on cross-examination as to their knowledge of disparaging rumors or common reports affecting his reputation. As the favorable testimony tends to sustain the presumption of innocence which the law indulges in favor of the defendant, by introducing it the defendant tenders an issue of fact, *viz.,* whether his reputation is such as the witnesses say it is, and the prosecution has the right to cross-examine the witnesses to ascertain the sufficiency of the grounds upon which they base their statements. If, therefore, it can be shown that there are or have been rumors or reports affecting the reputation, to this extent the statements of the witnesses are shown to be without foundation in fact and therefore not entitled to credit. (2 Wigmore on Evidence, sec. 988; Underhill on Criminal Evidence, sec. 82.) The purpose of the inquiry is to ascertain what the witness has heard to the disparagement of the reputation, and not his knowledge of particular acts of misconduct. Extrinsic evidence of particular ·wrongful acts is therefore not admissible, because it violates the rule against proof of particular facts to establish reputation, declared by the statute. (Rev. Codes, sec. 8024; Wigmore on Evidence, sec. 988; Underhill on Criminal Evidence, sec. 82; 1 McClain on Criminal Law, sec. 307.) The question as put by counsel assumed as a fact that the defendant did go to the Castle for the purpose stated. Though the statement was in the form of an interrogatory, it was as objectionable as if it had been stated in the form of a declaratory sentence and therefore was obnoxious to the rule against proof of particular facts. The situation was not aided by the negative answer of the witness. The answer

did not negative the fact stated, but only that the witness had heard of the fact. If he had answered in the affirmative, the answer would have implied the existence of the fact as well as hearsay knowledge of it by the witness. If it had not been answered at all, it was still objectionable, for it was calculated to leave the jury under the impression that the episode did occur, and hence to furnish them some basis for the damaging inference that the defendant was a lawless character. It is never proper for counsel to so frame questions as to assume the existence of facts which are not admissible if offered as independent evidence. (3 Wigmore on Evidence, 1808; Jones on Evidence, 2d ed., sec. 815; *Gale* v. *People,* 26 Mich. 157; *People* v. *Wells,* 100 Cal. 459, 34 Pac. 1078; *People* v. *Mather,* 4 Wend. (N. Y.) 229, 21 Am. Dec. 122; *Aiken* v. *People,* 183 Ill. 215, 55 N. E. 695; *State* v. *Irwin,* 9 Idaho, 35, 60 L. R. A. 716, 71 Pac. 608; *Howland* v. *Oakland Con. Ry. Co.,* 115 Cal. 487, 47 Pac. 255; *People* v. *Ah Len,* 92 Cal. 282, 27 Am. St. Rep. 103, 28 Pac. 286; *Krup* v. *Corley,* 95 Mo. App. 640, 69 S. W. 609.) The attorney who does it is guilty of misconduct which is wholly indefensible, not only because he is proceeding in total disregard of the fundamental rule of evidence, but is at the same time not fair to the defendant. Assuming that in putting the question as he did counsel did so with full knowledge of the limitations of the rule applicable, the observation made by the supreme court of California, in *People* v. *Mullings,* 83 Cal. 138, 17 Am. St. Rep. 223, 23 Pac. 229, and approved by this court in *State* v. *Rogers,* 31 Mont. 1, 77 Pac. 293, is pertinent: "It is quite evident that the questions, and not the answers, were what the prosecution thought important. The purpose of the questions clearly was to keep persistently before the jury the assumption of damaging facts which could not be proven, and thus impress upon their minds the probability of the existence of the assumed facts upon which the questions were based." Whether such questions are answered or not, the putting of them is condemned by the courts and text-writers as gross misconduct. (*State* v. *Rogers, supra;* Wigmore on Evidence, sec. 1808; *State* v. *Irwin, supra; Gargill*

v. *Commonwealth,* 12 Ky. Law Rep. 149, 13 S. W. 916; *People* v. *Grider,* 13 Cal. App. 703, 110 Pac. 586; *Watson* v. *State,* **7** Okl. Cr. 590, 124 Pac. 1101; *People* v. *Wells, supra.)* And we do not think the case is aided by the fact that similar questions put to witnesses previously called, as was the fact in one or two [4] instances, were permitted to pass unchallenged. By over-ruling the objection, the trial judge not only signified the opin-ion that the statement of fact embodied in the interrogatory was relevant and material, but stamped with approval the course pursued by the county attorney, thus emphasizing the error committed. The failure of counsel to object earlier did not justify the court in permitting further error; nor did his fail-ure to renew his objection thereafter when the same or similar questions were put to other witnesses. The objection should have been sustained and all similar questions subsequently asked should have been excluded. When a party has seasonably ob-jected to evidence of a certain character and his objection has been overruled, proper decorum would indicate that he should not thereafter interrupt the course of the trial by constant repe-tition of his objection. (*Schierbaum* v. *Schemme,* 157 Mo. 1, 80 Am. St. Rep. 604, 57 S. W. 526.)

Counsel for the defendant introduced the depositions of four witnesses who reside at Boise, Idaho, for the purpose of show-ing that the reputation of the deceased for peace was bad. All of them gave testimony to the effect that one Robert Johnson, who had for some years and until the latter part of the year 1911 been a resident of Boise, was reputed to be a turbulent, violent man. One of these witnesses was asked to attach to his deposition a photograph of Johnson, marking it with the initials of his name so as to identify it. This he did. Upon objection by the county attorney the photograph was excluded on the ground that it was irrelevant and immaterial. Counsel also offered the testimony of witnesses who knew the deceased, to identify the photograph as his. This was rejected on the same ground, the court remarking that it was the province of the jury to determine whether or not it was a photograph of

the deceased. The evident purpose of the offer was to render the evidence contained in the depositions of avail to the defendant, by showing definitely that the deceased was the same person to whose character they had testified. As it was not permitted to go to the jury with some evidence as to whose picture it was, the jury had no office to perform with reference to it, and the evidence of all these witnesses, as to the character of the deceased was in effect rendered worthless because there was nothing to identify the deceased as the man about whom the witnesses spoke, except the slight presumption arising from the identity in name. Even this slight presumption was probably wholly neutralized by a remark made by the court during the colloquy with counsel as to the admissibility of the photograph, to the effect that it might be that there were other persons who bore the name of Robert Johnson, thus indicating an opinion that there should be some evidence identifying the deceased as the man who had formerly resided in Idaho. The ruling was erroneous. While there is some diversity in the opinions of the [5] courts as to whether evidence of the reputation of the deceased is competent for any purpose unless it is known to the defendant at the time of the homicide (and evidence of such knowledge was not introduced at the trial of this case), the weight of authority, we think, gives support to the rule that when, as in this case, the issue is self-defense and there is doubt as to who was the aggressor, such evidence is admissible in order to enable the jury to resolve the doubt; for it is entirely in accord with every-day experience that a turbulent, violent man is more aggressive and will more readily bring on an encounter than one who is of the contrary disposition. (*State* v. *Shafer,* 22 Mont. 17, 55 Pac. 526; 1 McClain on Criminal Law, 307; 1 Wigmore on Evidence, sec. 63.) Such evidence serves the same purpose as uncommunicated threats, which are always admissible when the question is in doubt, in order to enable the jury to determine who probably brought on the conflict. (*State* v. *Shadwell,* 26 Mont. 52, 66 Pac. 508; *State* v. *Hanlon,* 38 Mont. 557, 100 Pac. 1035; *State* v. *Whitworth,* 47 Mont. 424,

133 Pac. 364.) This much we have taken occasion to say touching the competency of the evidence in question, in order to answer the argument of the attorney general who undertakes in his brief to justify the ruling on the ground that the reputation of the deceased is never competent unless it is first shown to have been known to the defendant.

It is the general rule, also, not questioned anywhere so far as we are aware, that when a photograph is shown to be a fair [6, 7] and correct representation of a person whose identity is in question, it is admissible to identify such person. That it is a fair and correct representation may be shown by the person who made it or by any competent witness. (McClain on Criminal Law, sec. 406; Underhill on Criminal Law, sec. 50; 1 Wigmore on Evidence, 660; *Mow* v. *People,* 31 Colo. 351, 72 Pac. 1069; *People* v. *Durrant,* 116 Cal. 179, 48 Pac. 75; *People* v. *Crandall,* 125 Cal. 129, 57 Pac. 785; *People* v. *Grill,* 151 Cal. 592, 91 Pac. 515; *State* v. *Roberts,* 28 Nev. 350, 82 Pac. 100.) In the case of *People* v. *Durrant, supra,* the witness who testified as to the character of the photograph in question was a sister of the deceased, and we think the court properly held that her testimony to the effect that it fairly represented the appearance of the deceased at the time of her death was entirely sufficient to warrant its admission. That the one offered here was such a representation of the deceased was not questioned. Besides, the witnesses whose evidence was offered as preliminary proof of its character apparently knew the deceased well in his lifetime. By excluding it the court virtually excluded the testimony of all the Idaho witnesses; and though there was some testimony by other witnesses, of the same import as that thus excluded, this did not render the error harmless. (*State* v. *Shadwell, supra.*) Nor was the photograph rendered inadmissible by the fact that it bore upon it some evidence that it had been taken while the deceased was an inmate of the state prison in Idaho. It appeared incidentally from the testimony of the witnesses, one of whom was the warden of the prison, that the deceased had served two terms in the prison. The warden testi-

fied that his observation of the deceased had been had and his acquaintance with him acquired, mainly during the imprisonment of the latter. This evidence went in without objection. It was not relevant to the inquiry in hand, and we think counsel, in the form of the interrogatories submitted to the witnesses, undertook to give undue prominence to the fact that deceased was an ex-convict, evidently with the purpose of giving to the jury the impression that he was a bad man. For this reason the court properly struck out several of the interrogatories with the answers to them; nevertheless the evidence as to the repu-. tation of deceased, even though it incidentally appeared from it that he was an ex-convict, being competent and material, it was prejudicial error to exclude the photograph and the evidence identifying it as a correct representation of the deceased. The court should have admitted it for the purpose for which it was offered, under proper restrictions, along with the depositions, after striking out the objectionable portions thereof.

It is argued that prejudicial error was committed in submitting the following instruction: "12. You are instructed [8] that in order to constitute murder of the first degree the killing must have been done and perpetrated with malice aforethought and must have been done willfully, deliberately and premeditatedly, and before the jury are authorized to convict the defendant of the crime of murder in the first degree, they should be satisfied from the evidence in the case beyond a reasonable doubt that the defendant killed Robert Johnson willfully, deliberately, premeditatedly and with malice aforethought, and you are instructed that if you find from all the evidence in the case beyond a reasonable doubt that the defendant, William Jones, shot and killed Robert Johnson on or about the 31st day of March in this year in the county of Lewis and Clark, in the state of Montana, with malice aforethought, willfully, deliberately and premeditatedly, and that he was not justified or excused for so doing, then you should find the defendant guilty of murder in the first degree." The criticism made is that the obligation resting upon the jury to be satisfied of the guilt of

the defendant beyond a reasonable doubt before they may find him guilty is absolute, whereas by the use of the term "should," instead of "must," the court left it discretionary with the jury to convict, whether they were so satisfied or not. The same criticism is made of instructions 13 and 14, as to the duty of the jury to acquit in case they should not be so satisfied. We think the contention is without substantial merit. But for the fact that we feel impelled to order a new trial because of error in the rulings upon the questions of evidence heretofore discussed, we should not deem the contention deserving of any notice. Of course, it is absolutely necessary that the jury be convinced beyond a reasonable doubt before they can convict, and that the duty to acquit, when the jury is not so convinced, is equally absolute. We venture the assertion that the average juror does not stop to speculate as to the distinctions in the meaning of such terms as "must," "ought" and "should," all denoting moral obligation, but recognizes the obligation of his official duty enjoined by the use of one of them as not differing in any respect from that enjoined by the use of the other. The average juror understands without being told in terms that in no case may a defendant be convicted unless the evidence establishes his guilt beyond a reasonable doubt. For present purposes we deem it sufficient to refer to the discussion of the terms in question, found in *State* v. *Blaine,* 45 Mont. 482, 124 Pac. 516, as conclusive against the contention of counsel. We suggest, however, that it is always wiser and safer for a trial court to use such terms in the formulation of its instructions as will inform the jury as to the full measure of their duty as well as the limitations imposed upon them by law.

Contention is made that the court erred in submitting the following instruction: "You are instructed that no provocation [9] by words only, however opprobrious or threatening, will mitigate an intentional killing, so as to reduce the killing to manslaughter." The objection interposed to it in the trial court was that there was no evidence in the case rendering this instruction necessary or proper. As we have already pointed out, un-

der the evidence, as we view it, the homicide was either murder or entirely justifiable. There is no ground in the evidence for any other conclusion. Davis testified that the defendant drew his revolver and shot the deceased without any words of threat or opprobrium by either. The defendant testified that the deceased, after applying to him an opprobrious epithet, first struck him and then shot him. While, therefore, it was entirely proper for the court in its instructions to define and distinguish the various grades of homicide as it did, and thus enable the jury to reach a correct conclusion (*State* v. *Shafer*, 26 Mont. 11, 66 Pac. 463), it would also have been proper to instruct them that if they were not satisfied that the homicide was murder, they should acquit the defendant. It was therefore neither necessary nor proper for the court to submit such an instruction as the one in question, when there was no evidence to which it could apply. (*State* v. *Calder*, 23 Mont. 504, 59 Pac. 903; *State* v. *Mitten*, 36 Mont. 376, 92 Pac. 969.) For this reason the instruction ought to have been refused. Counsel discuss somewhat at length in their brief the question whether the instruction is correct in point of law. This objection was not made in the trial court. We shall therefore not undertake to determine whether it is or not, because the question is not properly before us.

Complaint is made that the defendant was prejudiced by the [10] following instruction: "The law is that where a number of witnesses testify directly opposite to each other, the jury is not bound to regard the weight of the evidence as evenly balanced. The jury have the right to determine from the appearance of the witnesses on the stand, their manner of testifying, their apparent candor and fairness, their apparent intelligence or lack of intelligence, and from all the other surrounding circumstances appearing on the trial, which witnesses are the more worthy of credit and to give credit accordingly." It is said that the instruction as a whole permitted the jury to weigh the evidence under the rule applicable to civil cases, and, having so weighed it and ascertained on which side the scale preponder-

ated, to decide the case accordingly. It is also said that it is for this reason in direct conflict with other instructions in which the jury were told that in order to convict, the evidence must satisfy them of defendant's guilt beyond a reasonable doubt. The court had already properly instructed the jury as provided by the statute (Rev. Codes, sec. 8028) that they were not bound to decide in conformity with the declarations of any number of witnesses which did not produce conviction in their minds, against a less number or against a presumption or other evidence satisfying their minds. To this was added the second sentence of the instruction in question. This was entirely sufficient for all purposes. We agree with counsel that their criticism of the instruction in both particulars is justified. Even if it did not suggest an erroneous measure for the *quantum* of evidence necessary to warrant a conviction, it was well calculated to mislead and confuse the jury. From any point of view, such an instruction has no place in a criminal case.

The judgment and order are reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

Mr. Justice Holloway and Mr. Justice Sanner concur.

